**Byron B. KOHN, Acting Regional Director of Region 31 of the National Labor Relations Board, on behalf of the National Labor Relations Board, Petitioner,**

v.

**SOUTHWEST REGIONAL COUNCIL OF CARPENTERS and Carpenters Local Union No. 209, United Brotherhood of Carpenters and Joiners of America, Respondents.**

No. CV 03–5806GAF(SHX).

United States District Court, C.D. California.

Oct. 27, 2003.

Lavrel Spillane, Anne Pomerantz, Katherine Braun Mankin NLRB, Los Angeles, CA, for plaintiff.

Gerald V. Selvo, DeCarlo, Connor & Selvo, Los Angeles, CA, for defendant.

## MEMORANDUM AND ORDER RE: PETITION FOR A TEMPORARY INJUNCTION TO RESTRAIN LABOR ACTION

FEESS, District Judge.

### I.

### INTRODUCTION

The Southwest Regional Council of Carpenters, Local 209 ("the union") has been engaged in a lengthy labor dispute with M & M Interiors, Inc., a building trades company that allegedly pays its carpenters substandard wages and benefits. To publicize its dispute with M & M, union members have been displaying a banner and handing out leaflets at Silver Star Cadillac, a work site where M & M has been employed as a subcontractor by Carignan Construction Company ("Carignan"), the

prime contractor on a remodeling project. The union's banner reads "Labor Dispute: Shame on Cadillac/SAAB: Labor Dispute." The leaflets provide a more detailed description of the union's dispute with M & M.

Carignan filed a complaint with the National Labor Relations Board ("NLRB") to force the union to cease these activities, and the NLRB filed this petition. Petitioner Kohn, the Acting Regional Director of the NLRB, concedes the right of the union members to hand out leaflets at the construction site, but asserts that the union's "bannering" activity violates § 8(b)(4)(ii)(B) of the National Labor Relations Act ("NLRA"), which declares it to be an unfair labor practice to "threaten, coerce, or restrain any person engaged in commerce … where … an object thereof is … forcing … any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer …." In short, the NLRB takes the position that the display of the banner constitutes an illegal attempt to coerce secondary parties—Silver Star Cadillac and Carignan—into ceasing to do business with M & M. Through this petition, the Regional Director seeks a preliminary injunction under § 10(*l*) of the NLRA to force the union to cease displaying the banner during the pendency of this lawsuit before the NLRB.

Because the Regional Director has clearly established that the banner has been displayed (a fact the union does not dispute), the principle issue before the Court is whether the display of the banner constitutes a "threat, coercion or restraint" within the meaning of the statute. If the Court answers that question in favor of the NLRB, the Court must then address whether or not the statute, as applied, impermissibly infringes on protected First Amendment rights. If, on the other hand, the statute does not reach the challenged

activity, then the petition should be denied and the First Amendment issues need not be addressed.

The Regional Director has failed to persuade the Court that he has any reasonable prospect of proving at trial that the display of the banner violates the statute. On the contrary, this Court concludes that, under controlling Supreme Court precedent, the conduct of the union members in displaying the banner falls outside the scope of § 8(b)(4)(ii)(B)'s prohibition against activities that threaten, coerce, or restrain. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (*"DeBartolo II"*). *DeBartolo II* teaches that the NLRB's proposed construction, which would outlaw the union's mere display of the banner at the work site, raises serious First Amendment issues that need not be confronted because of the availability of a reasonable, alternative construction that conforms to congressional intent and the legislation's purposes. In short, the reasoning of *DeBartolo II* deomonstrates that the Regional Director's petition for a temporary injunction, based on a discredited construction of the statute, is meritless. Accordingly, the petition is **DENIED**.

## II.

## BACKGROUND

Sometime in October 2002, Silver Star Cadillac, an auto dealership in Thousand Oaks, California, commenced a remodeling project and engaged Carignan as the general contractor. Carignan, in turn, engaged M & M as a subcontractor to perform steel stud and drywall services at the jobsite. (Pet. at 4.) The present dispute arises out of the union's grievances with M & M, whom the union claims provides substandard wages and benefits to its employees.

Since approximately June 2, 2003, three to four union representatives have displayed a banner outside the premises of Silver Star Cadillac, on a public sidewalk.[1] (Memo at 6; Opp. at 14; Pet., Exh. 1 at 30.) The Banner is approximately four feet tall and twenty feet long. (*Id.*) In large, red letters on a white background, the banner reads "Shame on Cadillac/SAAB," while the words "Labor Dispute" flank this declaration on either side in smaller, pitched, black font. (*Id.*)

The union representatives holding this banner also pass out leaflets to those passing by. (Memo at 7; Opp. at 14; Pet. at 4–5.) These leaflets feature an illustration of a grungy, bedraggled rat gnawing on an American flag, bordered by the outline of a house. (Pet., Exh. 1 at 15.) The leaflets read, in full:

SHAME ON

Cadillac SAAB

For Desecration of the American
Way of Life

[Rat illustration]

A rat is a contractor that does not pay all of its employees prevailing wages, including either providing or making payments for health care and pension benefits.

Shame on **Cadillac SAAB** for contributing to erosion of area standards for carpenter craft workers. **M & M Interiors** is a sub contractor for **Carignan Construction** on **Cadillac SAAB's** dealership project located in the city of Thousand Oaks. **M & M Interiors** does not

meet area labor standards for all its carpenter craft workers, including fully paying for family health benefits and pension.

Carpenters Local 209 objects to substandard wage employers like **M & M Interiors** working in the community. In our opinion the community ends up paying the tab for employee health care and low wages tend to lower general community standards, thereby encouraging crime and other social ills.

Carpenters Local 209 believes that **Cadillac SAAB** has an obligation to the community to see that area labor standards are met for construction work at all their projects, including any future work. They should not be allowed to insulate themselves behind "independent" contractors. For this reason Local 209 has a labor dispute with all the companies named here.

**PLEASE TELL CADILLAC SAAB THAT YOU WANT THEM TO DO ALL THEY CAN TO CHANGE THIS SITUATION AND SEE THAT AREA LABOR STANDARDS ARE MET FOR CONSTRUCTION WORK ON THEIR DEALERSHIPS.**

The members and families of Carpenters Local 209 thank you for your support. Call (818) 364–9303 for further information.

WE ARE NOT URGING ANY WORKER TO REFUSE TO WORK NOR ARE WE URGING ANY SUPPLIER TO REFUSE TO DELIVER GOODS.

(*Id.* (emphasis in original).)

On June 16, 2003, Carignan filed a charge with the NLRB, alleging that the

---

1. The Regional Director contends that "at least" four individuals accompany the banner. (Memo at 2 (citing a copy of the union's leaflet, which does not support this contention).) The union, for its part, asserts that "[t]he banner display is accompanied only by the number of people required to physically hold it up and take staggered breaks, normally three in number, who remain at all times during the display doing so, except during their break periods." (Stewart Decl. ¶ 6; Opp. at 14.) The only clear photograph of the banner depicts three people holding it up. (Pet., Exh. 1 at 30.)

union is engaging in unfair labor practices within the meaning of NLRA § 8(b)(4)(ii)(B). (Pet. at 2.) The Regional Director concluded that he was required, under § 10(*l*) of the NLRA, 29 U.S.C. § 160(*l*), to petition this Court for the requested temporary injunction pending final disposition of this matter in proceedings now pending before the NLRB. (Pet. at 2, 7.) However, he concedes that the leaflets are lawful and seeks only to enjoin the union's bannering activities. (Memo at 7.)

## III.

## ANALYSIS

### A. THE STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

 This case presents a threshold question regarding the proper standard to be applied in assessing the Regional Director's petition for a preliminary injunction. The union argues that the Court should apply the traditional balancing test generally applied to applications for preliminary injunctions; the Regional Director disputes this and contends that he need only show "reasonable cause" for seeking the petition in order to obtain a preliminary injunction.

### 1. The Traditional Standard

The traditional standard would require the Regional Director to demonstrate a combination of probable success on the merits and a possibility of irreparable harm. *See, e.g., A & M Records v. Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir. 2001); *Miller v. Cal. Pac. Med. Ctr.,* 19 F.3d 449, 456 (9th Cir.1994). As the likelihood of success decreases, the obligation of the moving party to show the probability and seriousness of irreparable harm increases. *See id.* The Regional Director contends that this analytic framework does "not apply to § 10(*l*) proceedings." (Memo at 4.)

### 2. Section 10(l)'s "Reasonable Cause" Language

The Regional Director correctly observes that " § 10(*l*) is 'mandatory in nature' and expressly requires the Board to seek an injunction whenever it has 'reasonable cause' to believe that any of the listed unfair labor practices have occurred." (Memo at 4 (citing *Miller,* 19 F.3d at 456–57).) Section 10(*l*) reads, in pertinent part:

Boycotts and strikes to force recognition of uncertified labor organizations; injunctions; notice; service of process. Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of [§ 8(b)(4)(ii)(B) ] ..., the preliminary investigation of such charge shall be made forthwith .... If, after such investigation, *the officer or regional attorney to whom the matter may be referred has **reasonable cause** to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any district court of the United States ... within any district where the unfair labor practice in question has occurred ... for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition *the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems **just and proper***, notwithstanding any other provision of law ....

29 U.S.C. § 160(*l*) (emphasis added).

### 3. The Regional Director's "Reasonable Cause" Precedent

The statutory text suggests that the reasonable cause standard establishes the test the *Regional Director* should apply in determining whether or not to file a petition. Nevertheless, the Regional Director has identified a number of cases that suggest that § 10(*l*)'s reasonable cause language must guide the *Court's* decision regarding

issuance of the requested preliminary injunction. Foremost among these is *Nelson v. International Brotherhood of Electrical Workers*, 899 F.2d 1557 (9th Cir. 1990), in which the Ninth Circuit affirmed the district court's grant of a preliminary injunction prohibiting a labor union from enforcing an arbitration ruling, where the court found that enforcement of the ruling would constitute an unfair labor practice in the form of an unlawful collective bargaining agreement. *See id.* at 1561. The *Nelson* court did indeed interpret § 10(*l*) as the Regional Director suggests, finding that the district court should issue an injunction under that section "where there is 'reasonable cause to believe' that the violation charged has been committed, and [where] the issuance of an injunction is 'just and proper.'" *Id.* at 1560. Thus, *Nelson* and similar decisions established an alternate test for assessing applications for preliminary injunctions in NLRA cases.

### 4. The Ninth Circuit Rejected Nelson's Reasoning in Miller v. California Pacific Medical Center

The Regional Director's reliance on *Nelson* is misplaced. The *Nelson* court's reasoning on how district courts should analyze § 10(*l*) petitions relied principally on an interpretation of NLRA § 10(j) set forth in a line of cases that were squarely addressed and overruled by the Ninth Circuit *en banc* in *Miller v. California Pacific Medical Center*, 19 F.3d 449 (9th Cir.1994). The reasoning in *Miller* controls in this case.

### a. Miller's Background—The Nurses' Union Dispute

In *Miller*, two hospitals merged into a single entity. At one of the predecessor institutions, some 500 nurses were represented by the California Nurse's Association; at the other, some 800 nurses were not unionized. Because the majority of nurses at the combined entity were not members of the union, the merged entity gave notice that it would no longer recognize the union as the nurses' bargaining representative and would terminate its contract with the union when it expired. The NLRB Regional Director sought a preliminary injunction under § 10(j) to require the post-merger hospital to bargain in good faith with the union and to restore the union to its pre-merger status. *See id.* at 451–52. The District Court granted the preliminary injunction in a published opinion that expressly rejected the defendant's claim that the injunction should issue only upon a finding of likelihood of success on the merits and the possibility of irreparable injury. *See Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 788 F.Supp. 1112 (N.D.Cal.1992). The reviewing panel reversed, and the Circuit then took the matter *en banc* "to clarify the standards to be applied in reviewing § 10(j) petitions." *Miller*, 19 F.3d, at 451.

### b. The Incorporation of § 10(l)'s "Reasonable Cause" Language into § 10(j) Jurisprudence

The *en banc* panel analyzed the similarities and differences in §§ 10(j) and 10(*l*). The court observed that § 10(j) is broader than § 10(*l*) in that it is not limited to "[b]oycotts and strikes to force recognition of uncertified labor organizations," 29 U.S.C. § 160(*l*), and noted that § 10(j) leaves the NLRB with more discretion regarding whether or not to pursue a temporary injunction in district court than does § 10(*l*).[2] *See Miller*, 19 F.3d at 455.

---

**2.** Section 10(j) reads:

Injunctions. The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any district court of the United States ... within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for

Section 10(j) does not contain § 10(*l*)'s "reasonable cause" language, but both contain the same "just and proper" language. Of particular importance to the present case, the Circuit noted that, despite the absence of "reasonable cause" language in § 10(j), a line of cases including *Aguayo v. Tomco*, 853 F.2d 744 (9th Cir.1988), and *Scott v. El Farra Enters., Inc.*, 863 F.2d 670 (9th Cir.1988), had imported § 10(*l*)'s "reasonable cause" component into Ninth Circuit § 10(j) jurisprudence. *See Miller*, 19 F.3d at 456. Thus, the scope and meaning of the "reasonable cause" language were squarely before the *Miller* court.

### c. The "Reasonable Cause" Language Places no Limits on the District Court's Traditional Equitable Powers

The *Miller* court overruled *Tomco* and *El Farra, see id.* at 457, and heavily criticized incorporation of § 10(*l* )'s "reasonable cause" component into *any* district court analysis regarding the propriety of issuing a preliminary injunction:

> Section 10(*l*), unlike § 10(j), is mandatory in nature: Whenever the Board develops "reasonable cause" to believe that any one of the specified types of labor violations has occurred, it must petition the district court "for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter." 29 U.S.C. § 160(*l*). Even so, *in § 10(l), the "reasonable cause" requirement has to do with the Board's*

*own obligations under the Act—not with a constraint on the equitable powers of the district court once its jurisdiction has been properly invoked.*

> .... [T]he level of belief required to proceed to court cannot equate with the level of proof required to succeed in court; otherwise the court would have no discretion to exercise. That, in turn, would conflict with the plain meaning of the statutory conferral of jurisdiction to grant injunctive relief which the court deems "just and proper."

*Miller*, 19 F.3d at 456–57 (emphasis added).

Rejecting the "reasonable cause"/"just and proper" analysis performed by earlier courts in cases like *Nelson*, the *Miller* court ruled that district courts are to apply "traditional equitable criteria" in determining whether to grant preliminary injunctions under § 10(j). Although the *Miller* court did not explicitly address the standard to be applied in actions brought under § 10(*l* ), the court's reasoning applies with equal force to § 10(*l*). The Ninth Circuit made clear its intention to reject the "reasonable cause" analysis at the district court level, and this rejection comports with the plain meaning of § 10(*l*)'s wording: "If ... *the officer or regional attorney* to whom the matter may be referred has reasonable cause ... *he* shall, on behalf of the Board, petition any district court of the United States ...." 29 U.S.C. § 160(*l*) (emphasis added).[3]

appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall ... have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper. 29 U.S.C. § 160(j).

**3.** Even if *Nelson*'s reasonable cause standard were good law, *Nelson* is distinguishable from the present case on a number of grounds. First of all, the unfair labor practice at issue in *Nelson* did not involve any possible First Amendment conflict; rather, the court there

found that an arbitrator's ruling, if enforced, would have constituted an unlawful collective bargaining agreement under NLRA § 8(e). *See Nelson*, 899 F.2d at 1561. Likewise, in the one post-Miller case to apply the *Nelson* "reasonable cause" test—*Aguayo v. Local 13*, 1997 WL 912927 (C.D.Cal.1997)—the dispute presented no First Amendment issue, but rather concerned a jurisdictional dispute between two groups under § 8(b)(4)(ii)(D) of the NLRA. *Id.* at *4–5. By contrast, here the Court is asked to determine that the union's bannering activity—activity clearly involving

### d. The Statute's "Just And Proper" Language Encompasses Traditional Equitable Criteria

In order to be found "just and proper," pre-*Miller* Ninth Circuit cases "require[d] only that the relief be necessary to prevent a frustration of the remedial purposes of the Act." *Scott v. El Farra Enters., Inc.,* 863 F.2d 670, 674 (9th Cir.1988), overruled and quoted by *Miller,* 19 F.3d at 456–57. However, the *Miller* court ruled that " 'just and proper' is another way of saying 'appropriate' or 'equitable.' " *Miller,* 19 F.3d at 458.

Accordingly, the Court applies traditional equitable criteria in determining whether the requested temporary injunction should issue. The *Miller* court described these criteria as follows:

> Traditionally we consider (1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to the moving party if relief is not granted; (3) the extent to which the balance of hardships favors the respective parties; and (4) in certain cases, whether the public interest will be advanced by granting the preliminary relief. *United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 174 (9th Cir.1987). The moving party must show "either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of

success on the merits." [citing *Senate of Cal. v. Mosbacher,* 968 F.2d 974, 977 (9th Cir.1992).] "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Odessa Union,* 833 F.2d at 174.

*Id.* at 456; *see also Sammartano v. First Judicial District Court,* 303 F.3d 959, 965 (9th Cir.2002); *A & M Records v. Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir.2001). These traditional equitable criteria are discussed below in turn.

### B. THE REGIONAL DIRECTOR'S LIKELIHOOD OF SUCCESS ON THE MERITS

■ The first of the traditional equitable criteria to be evaluated is the petitioner's likelihood of success on the merits. This requires examination of whether the union's bannering conduct might violate § 8(b)(4)(ii)(B) of the NLRA. If so, the Court then must address whether or not the statute, as applied, impermissibly infringes the union's First Amendment rights—because the NLRB would have to clear this hurdle to succeed on the merits. If, however, the statute does not prohibit the union's bannering activity, then the Court need not address whether it would otherwise violate the First Amendment.

### 1. Secondary Picketing

According to the Regional Director, the banner qualifies as secondary picketing prohibited by § 8(b)(4)(ii)(B) of the NLRA. The relevant portions of that section read:

---

speech—constitutes threatening, coercive, restraining behavior violative of § 8(b)(4)(ii)(B).

*Nelson* is further distinguishable on the grounds that the *Nelson* court was concerned with labor activity found to be "disruptive of labor-management relations." *Nelson,* 899 F.2d at 1563. The Regional Director appears to recognize that the union's bannering activities have no such impact, as the union makes no attempt to persuade workers at Silver Star or at Carignan to strike, or suppli-

ers to boycott those companies. Rather, the Regional Director acknowledges that the union's activity is aimed at dissuading customers from patronizing Silver Star. (Memo at 11 ("Respondents' conduct amounts to unlawful traditional or signal picketing .... [They are taking action] in order to have consumers not patronize these businesses."); *id.* at 14 ("[T]he intent of the banner language is to request consumers to pressure or boycott Cadillac/SAAB.").)

(b) Unfair labor practices by labor organization. It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

(4) ... (ii) to *threaten, coerce, or restrain* any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

. . . . .

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

29 U.S.C. § 158(b)(4)(ii)(B) (emphasis added).[4]

■ The crucial question the Court must answer is whether the union's bannering activity amounts to threatening, coercive, or restraining conduct within the meaning of § 8(b)(4)(ii).[5] A similar question was addressed by the U.S. Supreme

---

4. A so-called "publicity proviso" follows the language quoted in the text:

[N]othing contained in ... paragraph [4] shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution.

29 U.S.C. § 158.

This proviso was considered at length by the Supreme Court in *Nat'l Labor Relations Bd. v. Fruit & Vegetable Packers & Warehousemen*, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) ("*Tree Fruits*"). However, in *Tree Fruits*, unlike the case at hand, the picket signs at issue (which the Court held did not violate § 8(b)(4)(ii)(B)) clearly identified the primary disputant. *See id.* at 71, 84 S.Ct. 1063. Because the union's banner in this case does not clearly identify the primary disputant, the language of the proviso cannot be said to clearly cover the present situation. Moreover, the proviso, by its terms, is more aptly applied to a situation in which picketers picket a secondary distributor for distributing goods produced by a primary disputant; it is less germane to the legality of action taken against a secondary business for its use of a contractor with whom a union has a primary dispute.

5. The Regional Director often uses the term "signal picketing" to describe the union's activity. (*E.g.*, Reply at 7 ("Respondents' *conduct* amounts to traditional or signal picketing, which has long been held to be violative of § 8(B)(4)(ii)(B).").) First, the Court notes that the Regional Director is using the term incorrectly in this case. As used in the labor law context, "signal picketing" generally refers to activity designed to induce employees to strike, not activity designed to inspire a consumer boycott. *See, e.g., United Wholesale & Warehouse Employees, Local 261*, 125 N.L.R.B. 520, 524 (1959) (finding "signal picketing" illegal under the NLRA "by reason of the implicit appeal to the employees ... who are employed by employers who are not parties to the labor dispute"). In this case, the activity at issue is no more or less illegal based on this characterization, for the label—if at all applicable—is used here in its most general sense, "to describe activity, short of a true picket line, which acts as a signal to neutrals that sympathetic action on their part is desired by the Union." *Int'l Ass'n of Bridge, Structural & Ornamental Workers v. NLRB*, 598 F.2d 1154, 1158 n. 6 (9th Cir. 1979).

Court in *DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Co.*, 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (*"DeBartolo II"*).

In that case, the respondent union had a primary labor dispute with a construction company working in the petitioner's shopping mall. *See id.* at 570–71, 108 S.Ct. 1392. The union distributed leaflets very similar to those distributed by union representatives in the case at hand, which "made clear that the union was seeking only a consumer boycott" against the entire mall in order to pressure the mall owner to use contractors paying "fair wages and fringe benefits." *Id.* The NLRB had found that the union's leaflets "constitute[d] 'economic retaliation' and [were] therefore a form of coercion" prohibited by § 8(b)(4)(ii)(B). *Id.* at 573, 108 S.Ct. 1392. The *DeBartolo II* Court disagreed, reasoning that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Id.* at 575, 108 S.Ct. 1392. The Court then found that "the Board's construction of the statute, as applied in this case, poses serious questions of the validity of § 8(b)(4)[ (ii)(B) ] under the First Amendment." *Id.*

The *DeBartolo II* Court further reasoned:

The case turns on whether handbilling such as involved here must be held to "threaten, coerce, or restrain any person" to cease doing business with another, within the meaning of § 8(b)(4)(ii)(B).

We note first that "inducing or encouraging" employees of the secondary employer to strike is proscribed by § 8(b)(4)(i). But more than mere persuasion is necessary to prove a violation of § 8(b)(4)(ii): that section requires a showing of threats, coercion, or restraints. Those words, we have said, are "nonspecific, indeed vague," and should be interpreted with "caution" and not given a "broad sweep[.]" ... There is no suggestion that the leaflets had any coercive effect on customers of the mall. There was no violence, picketing, or patrolling and only an attempt to persuade customers not to shop in the mall.

*Id.* at 578, 108 S.Ct. 1392 (citation omitted). Accordingly, the Court ruled that the handbilling activity before it did not violate § 8(b)(4)(ii)(B). *See id.* at 587, 108 S.Ct. 1392.

In this case, as in *DeBartolo II*, there is no evidence that the union's bannering or handbilling has been accompanied by violence, picketing, or patrolling.[6] No evidence has been presented that the union has posted its banner so as to block any entrance to the Silver Star dealership. (Pet., Exh. 1 at 30.) Moreover, it does not appear that the union representatives have acted aggressively in any way.

■ Since he can point to no misbehavior at the banner site, the Regional Director concentrates his attention on the "the intent of the banner language" in arguing that the union's banner display violates § 8(b)(4)(ii)(B). (*E.g.,* Memo at 14.) This focus is troubling because it is directed not at the union

---

**6.** One affidavit attached to the NLRB's Petition does describe some picketing, which is not referenced anywhere else in the papers. However, this picketing clearly appears to qualify as "primary" picketing and so is not activity covered by this petition: Jack Caviness testifies, "I observed ... approx 50 men with signs along the construction fence. The signs that they carried were all similar, and had red duct tape at the top with *M & M Interiors name,* the signs said unfair and had United Brotherhood of Carpenters Local 209 on it [sic]." (Pet., Exh. 1 at 26–27 (emphasis added).)

members' conduct, but necessarily at the content of their message. For that reason, the Regional Director's effort to stifle the message collides head-on with First Amendment principles that preclude prior restraints and content-based limitations on the display of signs, banners, and the like. *See* Part III.D., *infra*. Precedent plainly holds that it is not a banner's message or the intent of those displaying it that allows Congress to regulate union activities at secondary sites. Rather, the Supreme Court has focused on the speech/conduct distinction in defining the contours of permissible regulation in the present context. The Supreme Court has explicitly observed that " 'picketing is qualitatively "different from other modes of communication," ' " in that it "is 'a mixture of conduct and communication,' and the conduct element 'often provides the most persuasive deterrent to third persons about to enter a business establishment.' " *DeBartolo II*, 485 U.S. at 580, 108 S.Ct. 1392 (quoting *NLRB v. Retail Store Employees*, 447 U.S. 607, 619, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980) (Stevens, J., concurring)). Thus, analysis regarding whether the union's activity violates § 8(b)(4)(ii)(B) must focus on the union representatives' conduct, and not on their intent or on the content of their speech.

In addition to focusing on the union's "intent" behind its activities at Silver Star Cadillac, the Regional Director argues that the union's activity in this case "clearly amounts to coercive 'economic retaliation' within the meaning of the Act." (Memo at 14 (citations omitted).) Through this argument, the Regional Director implies that, because the bannering may persuade consumers to avoid doing business with Silver Star, and thereby induce Silver Star to sever its business relationship with Carig-

nan, the union's activities are prohibited by the statute. More succinctly, the Regional Director seems to claim that persuasive speech is prohibited speech. But the Supreme Court has made it clear that "economic coercion" in this sense does not rise to a statutory violation, and that some sort of intimidation is required before speech-related activities will transgress the prohibitions of § 8(b)(4)(ii)(B). *See Nat'l Labor Relations Bd. v. Fruit & Vegetable Packers & Warehousemen*, 377 U.S. 58, 72, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) ("*Tree Fruits* ") ("We disagree ... that the test of 'to threaten, coerce, or restrain' ... is whether [the secondary disputant] suffered or was likely to suffer economic loss."); *DeBartolo II*, 485 U.S. at 579, 108 S.Ct. 1392 ("Our decision in *Tree Fruits* ... makes untenable the notion that any kind of handbilling, picketing, or other appeals to a secondary employer to cease doing business with the [primary] employer ... is 'coercion' within the meaning of § 8(b)(4)(ii)(B) if it has some economic impact on the neutral."). Thus, the union's potential for success is not a measure of the legality of its bannering activities.

Finally, the Regional Director argues that the union's use of "the same colors as Silver Star's 'OPEN DURING REMODELING' sign" in its banner should contribute to a finding that the banner violates § 8(b)(4)(ii)(B). (Memo at 7.) However, it appears that this color scheme is the same one the union has used in many similar banners displayed in other similar disputes. Descriptions of approximately twenty-one uses of nearly identical banners utilizing the same "Shame on" language with the white, black, and red color scheme are attached to the Regional Director's petition as part of the record in a similar case before an NLRB Administrative Law Judge.[7] (Pet., Exh. 1 at 45–47,

---

7. This Administrative Law Judge ("ALJ") decision is discussed in more detail below, in Part IV.C., entitled "Deference to the Administrative Law Judge's Opinion."

49–54, 56–61, 63, 66–67.) The Regional Director has made no argument based on trademark rights nor on any other legal principle as to how the similarity in colors between the union's banner and Silver Star's "Open During Remodeling" sign could be found to render the banner illegal.

In sum, the Regional Director does not contend or show that the union representatives holding the banner patrol, shout, block entrances, or otherwise act aggressively. Thus, his attack impermissibly focuses on the presence of the banner and on the message it conveys, not on the only proper subject for regulation—the conduct of the union members at the secondary site. Since the Supreme Court, in *DeBartolo II*, construed § 8(b)(4)(ii)(B) to exclude from its sweep nonthreatening speech activities conducted at secondary sites like Silver Star Cadillac, the Regional Director's contention that the banner constitutes a threat, restraint, or coercion finds no support in controlling case law. Accordingly, the Court denies the NLRB's petition for a temporary injunction, because the Regional Director has not shown a likelihood that he will be able to prove the union violated § 8(b)(4)(ii)(B), and thus has not shown a likelihood of success on the merits.

### 2. *Fraudulent Speech*

Regardless of whether the union's activity constitutes secondary picketing prohibited by § 8(b)(4)(ii)(B), the Regional Director argues that the union's "use of *fraudulent language* on the banner . . . also constitutes unlawful coercive activity within the meaning of § 8(b)(4)(ii)(B)." (Memo at 9–10 (emphasis in original).) This is an odd argument, considering that § 8(b)(4)(ii)(B) does not specifically prohibit fraudulent speech, but only threatening, coercive, or restraining conduct, as discussed above.[8] The Regional Director's argument on this point is more properly framed as a counter-argument to the union's position that the requested injunction would violate its representatives' First Amendment rights.

The Regional Director cites *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), for the proposition that "the First Amendment does not protect the making of knowingly false statements, or statements made with reckless disregard of their falsity." (Memo at 15.) That decision, however, supports this proposition in the context of state law defamation proceedings, whereas the present petition is not based on any such cause of action. That the First Amendment does not protect false state-

---

**8.** *San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230 (9th Cir.1997), a Ninth Circuit decision reviewing a preliminary injunction barring handbilling and bannering activity in connection with a labor dispute, provides little guidance because it involved a different statute and a radically different set of facts. The statute at issue in that case, the Norris–LaGuardia Act ("NLA"), 29 U.S.C. §§ 101–115, expressly permits preliminary injunctions to prohibit publicity regarding a labor dispute in cases of "fraud or violence." *San Antonio Cmty. Hosp.*, 125 F.3d at 1234. The Ninth Circuit upheld the lower court's preliminary injunction barring the union's use of its banner in that case because it found "a high probability that members of the public would be and actually were deceived by the Union's use of the phrase 'THIS MEDICAL FACILITY IS FULL OF RATS' in the banner." *Id.* at 1236. The serious ambiguity in the message—its suggestion that the hospital was unsanitary and vermin-infested—created a false impression that went to the very heart of the hospital's mission. The present case does not present the prospect of a similar misunderstanding. Moreover, in *San Antonio Community Hospital*, the court found that once the union changed its banner to read "BEST INTERIORS IS THE RAT CONTRACTOR," display of the banner could no longer be enjoined under First Amendment principles because it was no longer false. *Id.* at 1238.

ments if made with malicious intent, as described by the *New York Times* Court, does not mean that such statements are prohibited by § 8(b)(4)(ii)(B) even if not otherwise threatening, coercive, or restraining.

Moreover, the Regional Director has failed to show that the union's banner is false in fact. The Regional Director recognizes that the union does have a dispute with the named, secondary entity (the Silver Star Cadillac/SAAB dealer), but he contends that the banner's message is fraudulent because "[t]he natural and foreseeable impression that the public would draw is that Respondents have a *primary* labor dispute with the named neutral Cadillac/SAAB." (Petitioner's Memo at 14.) On this point, a District Judge in the Southern District of California, who recently denied a nearly identical petition for a preliminary injunction brought by another NLRB Regional Director, astutely observed that

> the typical consumer cannot be expected to know the NLRA definition of 'labor dispute,' nor understand the distinction between primary and secondary labor disputes. Even if the banner[s] were to read 'secondary labor dispute' rather than 'labor dispute,' the effect would be the same as to the general public. The Court finds that the banners are not fraudulent.

(Answer to Pet., Exh.1 at 7.) This Court concurs in this observation and in the conclusion reached in that case.[9]

The union further points out that its banner is not false because, under the NLRA,

> The term "labor dispute" includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of per-

sons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, *regardless of whether the disputants stand in the proximate relation of employer and employee.*

29 U.S.C. § 152(9) (emphasis added). Thus, the banner's indication that the union has a "labor dispute" with the Silver Star Cadillac/SAAB dealership is true under the NLRA because that term includes primary and secondary disputes.

In sum, the union's banner, which is plainly designed to get the attention of members of the public in the hope of stimulating further inquiry into the dispute, is not "false" simply because it fails to inform the public as to with whom the union has its "primary," as opposed to "secondary," dispute, as those terms are defined by the NLRA. And because the Regional Director has failed to show that the union has engaged in any threatening, coercive, or restraining conduct, his petition must be denied. *See DeBartolo II,* 485 U.S. at 575, 108 S.Ct. 1392.

### C. IRREPARABLE HARM/BALANCE OF HARDSHIPS

■■■■ Traditional equitable criteria require that, where a petitioner has demonstrated a likelihood of success on the merits, a showing that a possibility of irreparable harm exists is further required before injunctive relief will issue; or, where the petitioner has only been able to show "the existence of serious questions going to the merits," the petitioner is required to show that "the balance of hardships" tips "sharply in its favor." *Miller,* 19 F.3d at 456. Normally, one is required to show that damages would be an inadequate remedy in order to make the required showing of irreparable harm. *See, e.g., id.* at 457. However,

---

**9.** This order, a copy of which was attached to the union's answer to the petition, is discussed further in Part IV.B. below, entitled "The Southern District's *Overstreet* Decision."

In statutory enforcement cases where the government has met the "probability of success" prong of the preliminary injunction test, we presume it has met the "possibility of irreparable injury" prong because the passage of the statute is itself an implied finding by Congress that violations will harm the public. Therefore, further inquiry into irreparable injury is unnecessary. However, in statutory enforcement cases where the government can make only a "colorable evidentiary showing" of a violation, the court must consider the possibility of irreparable injury.

*Id.* at 459.[10]

Because, as discussed above, the Regional Director has failed to meet the probability of success requirement for preliminary injunctive relief, a possibility of irreparable injury should not be presumed.[11] However, the Regional Director has failed to produce any evidence whatso-ever regarding a possibility of irreparable injury—or even indicating the existence of any hardships suffered by the secondary disputants.[12]

Examination of the affidavits and other evidence proffered in support of the petition does not indicate that the union's activity has had any negative impact on any of the secondary disputants' business. For instance, Jack Caviness, a Carignan employee, testifies in his affidavit supporting the NLRB's petition:

> [D]rive-in customers were not, for the most part, taking the leaflet. I saw about two drive-in customers take a leaflet and the large majority of customers I saw drive in drove right past the leafleters. I saw one person walk onto the lot, it was actor Tom Selleck, and he took a leaflet from the person handing them out.

(Pet., Exh. 1 at 17.)

There is no indication that anyone—not even Tom Selleck—turned around after

---

**10.** The quoted text provides the correct lens through which to view the issues of irreparable harm and balance of hardships. The union contends that the existence of a private right of action for damages under § 303(b) of the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 187(b), eases any burden on the businesses affected by the union's bannering. Therefore, argues the union, there is no showing of irreparable harm or that the balance of hardships tips in favor of the NLRB. (Opp. at 13.) However, the *Miller* court did not consider the adequacy of money damages in its irreparable harm calculus, and neither does this Court. Rather, because this is a statutory enforcement case, the Court must focus on the NLRB's likelihood of success.

**11.** The Regional Director argues that issuance of the requested injunction would be "just and proper" within the meaning of § 10(*l*) because, "[i]n light of the special importance that Congress has attached to § 10(*l*) offenses, there is a strong presumption that temporary injunctive relief is needed to prevent disruptions and irreparable harm to the free flow of commerce." (Memo at 20 (citing *Nelson*, 899 F.2d at 1563).) Such reasoning depends on pre-*Miller* cases and ignores the *Miller* court's ruling that " 'just and proper' is another way of saying 'appropriate' or 'equitable.' " *Miller*, 19 F.3d at 458.

**12.** The Regional Director summarily contends that "[e]ven applying traditional equitable standards, ... there is irreparable harm to the free flow of commerce and a need to protect the public interest." (Memo at 20 n.11 (no citation given).) In his reply, the Regional Director points to the ALJ's opinion attached to his petition as support for this proposition. (Reply at 6 n.2 (citing Pet., Exh. 1 at 76).) However, review of the cited portion of that opinion fails to support the proposition; rather, the ALJ simply concluded that "the bannering conduct constituted picketing," and "that Respondent Unions' intents and purposes in bannering were secondary." (Pet., Exh. 1 at 76.) There is no discussion of irreparable harm or of any hardship the bannering may have imposed on the secondary disputants targeted.

reading the union's banner or leaflets (which is not to say that the activity would necessarily be prohibited were this the case). Thus, even were the Court to conclude that the Regional Director has made a "colorable evidentiary showing" of a § 8(b)(4)(ii)(B) violation, there is no evidence that the balance of hardships tips in his favor. *Miller,* 19 F.3d at 459.

### D. FIRST AMENDMENT CONCERNS RAISED BY THE NLRB'S CONSTRUCTION OF § 8(b)(4)(ii)(B)

As noted in the discussion of petitioner's likelihood of success on the merits, the Regional Director's proposed interpretation of § 8(b)(4)(ii)(B)—that it prohibits the union's bannering activity based on the intent behind and persuasiveness of the banner—would raise serious First Amendment concerns because of its focus on the banner's content. *See R.A.V. v. City of St. Paul,* 505 U.S. 377, 391, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("The First Amendment does not permit [the government] to impose special prohibitions on those speakers who express views on disfavored subjects."); *Hudgens v. NLRB,* 424 U.S. 507, 520, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) ("while [the government] may constitutionally impose reasonable time, place, and manner regulations on the use of its streets and sidewalks for First Amendment purposes, ... [it] may not ... discriminate in the regulation of expression on the basis of the content of that expression."); *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) ("The central problem with Chicago's ordinance is that it describes permissible picketing in terms of its subject matter.... The operative distinction is the message on a picket sign. But, above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.").

■■■ Before enjoining the union's bannering activity, the Court would have to fully grapple with the implications of the fact that the union representatives have been displaying their banner on a public sidewalk. "[P]ublic streets and sidewalks, [are] traditional public fora that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Boos v. Barry,* 485 U.S. 312, 318, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (quoting *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). "In such places, which occupy a 'special position in terms of First Amendment protection,' the government's ability to restrict expressive activity 'is very limited.'" *Id.* (quoting *United States v. Grace,* 461 U.S. 171, 180, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)).

Finally, any preliminary injunction issued by this Court, prior to a full adjudication of the union's First Amendment claims on their merits, clearly runs the risk of imposing an impermissible prior restraint on speech. *See Alexander v. United States,* 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993) ("Temporary restraining orders and permanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints."); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 390, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) ("The special vice of a prior restraint is that communication will be suppressed ... before an adequate determination that it is unprotected by the First Amendment."); *Org. for a Better Austin v. Keefe,* 402 U.S. 415, 418–19, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971) (finding that a temporary "injunction, so far as it impose[d] prior restraint on speech and publication, constitute[d] an impermissible restraint on First Amendment rights," and that "[a]ny prior restraint on expression

comes to this Court with a 'heavy presumption' against its constitutional validity"); *Near v. Minnesota,* 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) (finding that a statute prohibiting publication of certain newspapers constituted a "previous restraint" on speech, and that such restraints are invalid in all but the most extreme cases, such as when one seeks to publish "the sailing dates of transports or the number and location of troops" during wartime); *Latino Officers Ass'n. New York, Inc. v. City of New York,* 196 F.3d 458, 465 (2d Cir.1999) ("The danger of a prior restraint, as opposed to ex post disciplinary action, is precisely that making predictions ex ante as to what restrictions on speech will ultimately be found permissible is hazardous and may chill protected speech.").

 Accordingly, the Court rejects the NLRB's proffered interpretation of § 8(b)(4)(ii)(B). *See DeBartolo II,* 485 U.S. at 575, 108 S.Ct. 1392 ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court [should] construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."); *Boos,* 485 U.S. at 333, 108 S.Ct. 1157 ("[I]t is well-established that statutes should be construed to avoid constitutional questions if such a construction is fairly possible."). The Court's interpretation of § 8(b)(4)(ii)(B) is a natural one that flows easily from the plain meaning of the statute's wording and is supported by Supreme Court precedent: "[M]ore than mere persuasion is necessary to prove a violation of § 8(b)(4)(ii): that section requires a showing of threats, coercion, or restraints." *DeBartolo II,* 485 U.S. at 578, 108 S.Ct. 1392. And because the Court finds that the union's activity is not threatening, coercive, or restraining within the meaning of § 8(b)(4)(ii)(B), as the Supreme Court has interpreted those words, the First Amendment problems im-

plicated by the NLRB's proffered interpretation need not be addressed.

## IV.

## THE PARTIES' ESTOPPEL ARGUMENTS

Both parties argue that the issues raised in the present petition have previously been resolved in their favor, and that these previous rulings are controlling here under principles of collateral estoppel and agency deference. Clearly, if either of the parties were correct, the Court's analysis set forth above would have been unnecessary. However, because the Court concludes that none of these estoppel arguments carry the day, analysis of these issues has been left to the end of this memorandum.

### A. ESTOPPEL BASED ON THE NLRB'S 1997 ADVICE MEMORANDUM

 The union attaches a 1997 NLRB advice memorandum to its opposition, in which the NLRB considered the legality of secondary bannering and handbilling activities very similar to the union activity at issue here. (Opp., Exh. 3 at 45.) At that time, the NLRB reached precisely the same conclusion reached by this Court in this case—that in light of Supreme Court precedent, § 8(b)(4)(ii)(B) does not bar such displays of banners at secondary sites. (*Id.* at 48, 51.) For reasons not provided to the Court, despite the Court's inquiry on this point, the NLRB has more recently determined that it need not adhere to the ruling in *DeBartolo II.*

 The union contends that, based on this 1997 memo, the NLRB should be estopped from bringing this petition. According to the union, "all of the usual elements of estoppel are present here: a representation, reasonably relied upon to a person's detriment, and damages." (Opp. at 41.) "[T]he prevailing rule is that ad-

ministrative determinations may be given collateral estoppel effect between the parties and their privies if they are the result of fair adversary hearings and are supported by substantial evidence[,] but that where these elements are lacking no such effect should be accorded them." *Atlantic Richfield Co. v. Fed. Energy Admin.*, 556 F.2d 542, 549–50 (Em.App.1977).

The union has not shown that the 1997 advice memorandum was the result of fair adversary proceedings and was supported by substantial evidence. Accordingly, the Court declines to find that the NLRB is estopped from bringing this petition for a temporary injunction on the basis of the 1997 advice memorandum. However, in view of the Court's ruling in the union's favor on the merits, this determination ultimately has no impact on the outcome of the present petition.

**B. THE SOUTHERN DISTRICT'S *OVERSTREET* DECISION**

 On May 7, 2003, Judge Napoleon A. Jones, Jr. of the United States District Court for the Southern District of California issued an order in the case of *Overstreet v. United Brotherhood of Carpenters & Joiners of America*, No. CV 03–0773 J(JFS), denying an NLRB Regional Director's petition for a temporary injunction that would have enjoined bannering and leafleting activities nearly identical to those at issue in this case. (Answer to Pet., Exh. 1.) The union argues that the *Overstreet* decision precludes the NLRB from relitigating this issue here. (Opp. at 1.) The Regional Director, however, contends that *Overstreet* does not bar this action because "neither of the Respondents in this case was a respondent in Overstreet," and "the doctrine of non-mutual defensives [sic] collateral estoppel does not apply to the Board, a federal government agency." (Memo at 24.) The Court agrees that the NLRB is not estopped from bringing this petition.

The Court notes that the Regional Director named Local 1506 of the United Brotherhood of Carpenters and Joiners of America as a respondent in *Overstreet*, but named Local 209 as a respondent here. "[T]he Supreme Court [has] announced a possibly ambiguous but potentially broad rule that has come to leave little room for nonmutual preclusion against the government in civil cases." 18A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4465.4 at 789 (2d ed.2002); *see also United States v. Mendoza*, 464 U.S. 154, 162, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984); *United States v. AMC Entm't, Inc.*, 232 F.Supp.2d 1092, 1117 (C.D.Cal.2002). In order for *Overstreet* to control here, the union must "offer evidence to show that there was a mutuality of parties in the previous litigation." *AMC Entm't*, 232 F.Supp.2d at 1117. Because the union has failed to make this required showing, the Court will not give the Southern District's decision collateral estoppel effect here. Again, however, in view of the Court's ruling in the union's favor on the merits, this determination also has no impact on the outcome of the present petition.

**C. DEFERENCE TO THE ADMINISTRATIVE LAW JUDGE'S OPINION**

 Although the Regional Director argues that this Court should not be persuaded by the *Overstreet* decision, at several points the Regional Director points to a recent decision by an NLRB Administrative Law Judge ("ALJ") which he attaches to his petition, and argues that the Court should defer to it. (Pet., Exh. 1 at 38.) In the attached decision, *Local Union No. 1827*, 2003 WL 21206515 (May 9, 2003), the ALJ considered charges brought by the NLRB, on behalf of a number of businesses not involved in this action, against a number of local branches of the United Brotherhood of Carpenters and Joiners of

America, one of which is named as a Respondent here. The ALJ recounted union activity nearly identical to that at issue here, and concluded that "[s]ince the conduct was directed at neutral companies and since it was picketing, it is proscribed by Section 8(b)(4) and unprotected by the First Amendment." (Pet., Exh. 1 at 68.)

Thus, the ALJ reached a conclusion at odds with the conclusion reached by this Court and by the *Overstreet* court regarding nearly identical conduct. This disparity arises from the ALJ's conclusion that, relying on NLRB precedent, the union's conduct constituted "picketing," and was thus prohibited by § 8(b)(4)(ii)(B). (Pet., Exh. 1 at 71.) By contrast, the *Overstreet* court prudently relied on Supreme Court precedent to conclude that the union's "bannering activity lacks the confrontational, sometimes intimidating conduct associated with traditional picketing." (Answer to Pet., Exh. 1 at 8.) The ALJ either overlooked or ignored *DeBartolo II*'s determination that "more than mere persuasion is necessary to prove a violation of § 8(b)(4)(ii)(B): that section requires a showing of threats, coercion, or restraints." *DeBartolo II*, 485 U.S. at 578, 108 S.Ct. 1392.

Nonetheless, the Regional Director argues: "Given the labor law expertise of the ALJ, and the lesser exposure of this Court to the Act and its mandates, the Court should rely more heavily on the views of the ALJ than on the contrary views in *Overstreet*." (Memo at 24.) This argument misses the point that Congress empowered the District Court, not an ALJ, to determine whether to grant or deny a Regional Director's request for a temporary injunction. *See* 29 U.S.C. § 160(*l*) ("[T]he district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper."); *Miller*, 19 F.3d at 457–58 ("'[J]ust and proper' is another way of

saying 'appropriate' or 'equitable.'"). While the ALJ may have greater substantive labor law expertise than this Court, this Court has substantial experience in the assessment of applications for preliminary injunctions, the art of statutory construction, and the application of federal and Supreme Court precedent to issues of constitutional concern. Because these are the areas of concern raised by this petition, the Regional Director provides no persuasive reason why the Court should abdicate its constitutional duty to independently determine the merits of this case.

Elsewhere the Regional Director argues that the ALJ decision "is indicative of the likelihood of success on merits," and that "[f]rom this showing, the Court then presumes irreparable injury." (Reply at 6 n.2.) Not so. The NLRA creates a complex administrative framework, with separate prosecutorial and adjudicatory entities. Within this scheme, the ALJs function much like trial court judges; an ALJ's decision is appealed first to the NLRB, whose decisions are in turn subject to review by the U.S. Circuit Courts. *See generally* II THE DEVELOPING LABOR LAW 2443–47, 2516–17, 2569–73 (Patrick Hardin & John E. Higgins, Jr., eds., 4th ed.2001). While any final determination on the merits by the NLRB "will be given considerable deference" in the federal courts, the Board has not yet ruled on this matter. *Miller*, 19 F.3d at 460. Moreover, "it is the courts of appeal which are obliged to afford deferential review to final Board determinations, not the district courts in response to preliminary requests." *Id.* at 458. Finally, neither the NLRB, the ALJ, nor this Court are empowered to violate the First Amendment's commandments. Analysis under *DeBartolo II* leads to the inevitable conclusion that the Court should avoid the serious First Amendment concerns implicated by the requested injunction, and

find that the union's bannering activity does not fall within the sphere of activity prohibited by § 8(b)(4)(ii)(B).

## V.

## CONCLUSION

The Regional Director has failed to show that the union's activity of which he complains is prohibited by § 8(b)(4)(ii)(B). Accordingly, the Regional Director has failed to show a likelihood of success on the merits, or that there is even reasonable cause for the requested temporary injunction to issue. "[T]he Board's construction of the statute, as applied in this case, poses serious questions of the validity of § 8(b)(4)[ (ii)(B) ] under the First Amendment," and "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court [should] construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *DeBartolo II*, 485 U.S. at 575, 108 S.Ct. 1392. Because the Regional Director has failed to show that the union's activity is threatening, coercive, or restraining within the meaning of § 8(b)(4)(ii)(B), as those words have been interpreted by the Supreme Court, this petition for a temporary injunction is **DENIED**.

IT IS SO ORDERED.