**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CORNELE A. OVERSTREET, Regional
Director for Region 28 of the
National Labor Relations Board,
for and on behalf of the National
Labor Relations Board,
            *Petitioner-Appellant,*

            v.

UNITED BROTHERHOOD OF
CARPENTERS AND JOINERS OF
AMERICA, LOCAL UNION NO. 1506,
            *Respondent-Appellee.*

No. 03-56135

D.C. No.
CV-03-00773-NAJ

OPINION

Appeal from the United States District Court
for the Southern District of California
Napoleon A. Jones, District Judge, Presiding

Argued and Submitted
March 2, 2004—Pasadena, California

Filed June 8, 2005

Before: Andrew J. Kleinfeld, Kim McLane Wardlaw, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Judge Kleinfeld

6547

**COUNSEL**

Robert Oddis (argued), Arthur F. Rosenfeld, John E. Higgins, Jr., Barry J. Kearney, Judith I. Katz, Aaron N. Karsh, and Robert N. Oddis (on the briefs), National Labor Relations Board, Washington, D.C., for the petitioner-appellant.

Gerald V. Selvo, DeCarlo, Connor & Selvo, Los Angeles, California, for the respondent-appellee.

**OPINION**

BERZON, Circuit Judge:

The National Labor Relations Board ("NLRB" or "the Board") Regional Director, Cornele Overstreet, seeks to enjoin members of a building trades union from holding aloft large banners announcing a "labor dispute." The banners are located so that they are visible to customers of businesses that deal with certain contractors who do not have union contracts. While the banners are displayed, other union members distribute handbills that explain the "labor dispute." The questions before us involve interpretation of the National Labor Relations Act ("the NLRA" or "the Act"), 29 U.S.C. § 151 *et seq.*, set against the backdrop of First Amendment concerns raised by the request to enjoin peaceful speech activity. We conclude

that the district court correctly declined to issue the injunction.

## I.    Background

For several years, the United Brotherhood of Carpenters and Joiners of America, Local Union Number 1506 ("the Carpenters") have had a labor dispute with three contracting companies — Brady Company/San Diego ("Brady"), Precision Hotel Interiors ("Precision"), and E&K Arizona ("E&K"). The Carpenters object to those companies' employment of non-union employees and their alleged failure to meet local labor standards — especially wage standards — on construction projects in the Phoenix, Los Angeles, and San Diego metropolitan areas.

The Carpenters decided to try to induce Brady, Precision, and E&K to change their labor practices, by influencing the contracting practices of some companies ("the Retailers"[1]) that do business with them. The Carpenters sent the Retailers, also located in or around Phoenix, Los Angeles, and San Diego, letters promising an "aggressive public information campaign against [Brady, Precision, or E&K]," including "highly visible banner displays" at the Retailers' places of

---

[1]These companies include retailers and general contractors who hired Brady, Precision, or E&K on various construction projects. The majority of these companies are retailers, and we will refer to them by that shorthand.

The Retailers are so situated that the parties and the district court refer to them as "secondaries" or "secondary businesses," consistent with the tradition in labor law of so referring to employers other than those whose own labor relations policies a union seeks to change. *See* Howard Lesnick, *The Gravamen of the Secondary Boycott*, 62 COLUM. L. REV. 1363, 1364 (1962) (noting common understanding that § 8(b)(4) of the NLRA governs union actions related to "secondary" but not "primary" businesses). The term "secondary" does not appear in the Act, *see* 29 U.S.C. §§ 151-169, and has taken on a talismanic significance that sometimes obscures rather than advances useful legal analysis. We therefore use the term sparingly.

business. The letters urged the Retailers "to not allow [Brady, Precision, or E&K] to perform any work on any of your projects unless and until it generally meets area labor standards." Taking this step, the letters said, would "provide the greatest protection against your firm becoming publicly involved in this dispute."

When the Retailers did not respond, the Carpenters decided to protest at the site of eighteen Retailers that continued to contract with Brady, Precision, or E&K. Near each Retailer but one,[2] the Carpenters set up a four foot by fifteen foot banner that read "SHAME ON [NAME OF RETAILER]" in large red letters, with the words "LABOR DISPUTE" in somewhat smaller black letters on either side of that text. No other words or images appeared on the banners. Individual union members held the banners anywhere from twenty to several hundred feet from the Retailers' entrances. The members also distributed handbills to passing pedestrians, explaining the nature of the "labor dispute." The handbills specified that their underlying complaint was with Brady, Pecision, and E&K, and that the Carpenters believed that by using the service of those three contractors the Retailers were aiding them in undermining regional labor standards.

The Carpenters placed the banners on public sidewalks, facing away from the Retailers. In the vast majority of cases, the Carpenters placed the banners at a significant distance — scores if not hundreds of feet — away from the Retailers' entrances. The Carpenters generally placed the banners to be as visible as possible to passing motorists and other members of the public. There is no indication that the banners were directed at employees of the Retailers, or that any employee declined to work on account of the banners. At no point did the Carpenters block the entrances to the Retailers or directly confront individual customers of those businesses through

---

[2]Outside one Retailer, a restaurant, the banner read, "DON'T EAT AT ANTHONY'S FISH GROTTO."

chants, shouts, or any other means. The Carpenters, instead, remained generally stationary and quiet throughout their bannering activity.

One of the Retailers, Artisan Homes, Inc., responded to the Carpenters' banner with a banner posted on their work site that read: "We Support Our Subcontractors! It's a Right to Work State . . . Shame on Carpenters Local Union 1506." (Ellipsis in original).

E&K and two of the Retailers — Associated General Contractors of America ("AGC") and Westin Bonaventure Hotel ("Westin") — filed charges with the NLRB against the Carpenters, alleging that the union's bannering activities[3] constituted unfair labor practices in violation of § 8(b)(4)(ii)(B) of the Act, 29 U.S.C. § 158(b)(4)(ii)(B).[4] After the NLRB General Counsel issued a complaint against the Carpenters under § 10(b) of the Act, 29 U.S.C. § 160(b), Overstreet filed a petition in the United States District Court for the Southern Dis-

---

[3]E&K and AGC's complaints specified only the Carpenters' bannering, not the union's handbilling. Westin's complaint specified both activities, but all parties subsequently focused exclusively on the bannering.

[4]Section 8 of the NLRA, 29 U.S.C. § 158, reads, in relevant part:

> (b) It shall be an unfair labor practice for a labor organization or its agents . . . (4) . . . (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . . (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

29 U.S.C. § 158(b)(4)(ii)(B).

trict of California, pursuant to § 10(*l*) of the Act,[5] 29 U.S.C. § 160(*l*), seeking injunctive relief barring the Carpenters' bannering activity pending the NLRB's final resolution of the complaint.[6] Overstreet argued that the bannering violates § 8(b)(4)(ii)(B) of the Act because the visibility of the banners to customers — even those banners placed several hundred feet from the entrances of the Retailers — makes the bannering "picketing," and, in the alternative, because the banners include a fraudulent claim — that there is a "labor dispute" with the Retailer — and therefore constitute economic coercion.

The district court denied the petition in a decision issued on May 7, 2003. The district court noted that the Carpenters do not block access to the Retailers' entrances, nor do the union members patrol areas near the Retailers' places of business or initiate any verbal interactions with the public. The court concluded that "[t]he bannering activity lacks the confrontational, sometimes intimidating conduct associated with traditional picketing." Further, the district court ruled, because the Carpenters believes that the Retailers' decision to do business

---

[5]Section 10(*l*) of the NLRA, 29 U.S.C. § 160(*l*), reads, in relevant part:

> Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title . . . the preliminary investigation of such charge shall be made forthwith . . . . If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law . . . .

[6]Overstreet's petition does not mention the Carpenters' handbills and did not seek an injunction against that activity.

with Brady, Precision, and E&K contributes to the erosion of labor standards, the union does, in fact, have a "labor dispute" with the Retailers, so the banners are not fraudulent or misleading.

The NLRB consolidated the General Counsel's administrative complaint against the Carpenters with complaints regarding similar activities involving other Carpenters locals. The matter was tried before an Administrative Law Judge ("ALJ") in January 2003. The ALJ issued her decision on May 9, 2003, ruling in the complainants' favor.[7] The ALJ asserted that "[a]ctivity short of a traditional picket line that signals neutrals that sympathetic action on their part is desired by the union is regarded as signal picketing," and concluded that the Carpenters' bannering constituted "picketing." The ALJ further ruled that (1) the Carpenters intended this picket as a means to coerce the Retailers to cease doing business with

---

[7]The ALJ issued her decision just after the district court entered its order, so her decision is not part of the record before us. The ALJ's ruling, however, is an adjudicative fact, and neither its existence nor its contents are disputed. We therefore take judicial notice of it pursuant to Federal Rule of Evidence 201. *See Transmission Agency v. Sierra Pac. Agency Co.*, 295 F.3d 918, 924 n.3 (9th Cir. 2002).

Since the ALJ decision in this case, four ALJs have concluded that § 8(b)(4)(ii)(B) does not prohibit similar bannering activities, while one has agreed with the ALJ in this case that § 8(b)(4)(ii)(B) does do so. *Compare United Bhd. of Carpenters & Joiners of Am., Locals 184 & 1498 (Grayhawk Dev., Inc.)*, 2005 NLRB Lexis 17 (Jan. 13, 2005); *United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506 (Sunstone Hotel Investors)*, 2005 NLRB Lexis 5 (Jan. 6, 2005); *S.W. Reg'l Council of Carpenters (New Star Gen. Contractors)* 2004 NLRB Lexis 660 (Nov. 12, 2004); *S.W. Reg'l Council of Carpenters (Covi Concrete Constr., Inc.)*, 2004 NLRB Lexis 74 (Feb. 18, 2004); *with S.W. Reg'l Council of Carpenters (Held Props., Inc.)*, 2004 NLRB Lexis 159 (Apr. 2, 2004). Two district courts have followed the district court in this case in refusing Regional Directors' requests for injunctive relief in similar cases. *See Benson v. United Bhd. of Carpenters & Joiners of Am., Locals 184 & 1498*, 337 F. Supp. 2d 1275 (D. Utah 2004); *Kohn v. S.W. Reg'l Council of Carpenters*, 289 F. Supp. 2d 1155 (C.D. Cal. 2003). The NLRB has yet to rule in any of the cases.

Brady, Precision, and E&K; and (2) the words "labor dispute" in conjunction with naming the Retailers could only have "conveyed to viewers, including customers and suppliers, . . . that [the Carpenters] had primary labor disputes with the [Retailers] named on the banners." The ALJ concluded, finally, that distributing explanatory handbills did not mitigate the message of the banners, because the banners were directed in some measure at passing motorists while only pedestrians received handbills. Accordingly, the ALJ found that the Carpenters' bannering activities violated § 8(b)(4)(ii)(B) and recommended that the NLRB order the Carpenters to cease and desist its bannering.

The Carpenters had argued to the ALJ that its bannering constituted "pure speech," which could not be constitutionally enjoined and does not fall within the Act's prohibitions. The ALJ did not respond to these arguments, except to say that because the bannering was "picketing," it fell outside the boundaries of the Supreme Court's First Amendment cases.

The Carpenters appealed the ALJ's ruling to the NLRB. On June 27, 2003, Overstreet filed this appeal of the district court's ruling.

## II.   Section 10(*l*) injunction standards

We review a grant or denial of a § 10 injunction for abuse of discretion. The district court abuses its discretion if it relies on a clearly erroneous finding of fact or an erroneous legal standard. *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 455 (9th Cir. 1994) (*en banc*). We review the legal standards applied by the district court *de novo*. *Id.*

[1] The district court, relying on *Nelson v. International Brotherhood of Electrical Workers, Local Union No. 46*, 899 F.2d 1557 (9th Cir. 1990), asked whether Overstreet had "reasonable cause" to believe that the Carpenters had violated § 8(b)(4)(ii)(B). Under *Nelson*, a "district court may find 'rea-

sonable cause' where the factual allegations and propositions of law underlying the Regional Director's petition are not insubstantial and frivolous." *Id.* at 1560 (quotation and citations omitted). Overstreet argues that the district court erred by failing to find reasonable cause under this generous standard.

**[2]** In so arguing, Overstreet assumes that *Nelson* remains the governing standard. *Miller*, however, decided *en banc* and later than *Nelson*, concluded that ordinary standards governing the issuance of injunctions, not a special standard highly deferential to the Regional Director, govern petitions for injunctions under § 10(j) of the Act, 29 U.S.C. § 160(j), another NLRA provision permitting preliminary injunctive relief for alleged violations of the Act. We must first decide, consequently, whether *Miller* effectively overruled the *Nelson* § 10(*l*) standard. Evaluating the standards for granting an injunction under § 10(*l*) of the Act for the first time since we decided *Miller*, we hold that *Miller* overruled *Nelson*, and that we should apply the *Miller* standard here.[8]

## A.  *Miller* & "reasonable cause"

*Miller* involved § 10(j) of the Act,[9] an injunctive provision

---

[8]Ordinarily, a three-judge panel "may not overrule a prior decision of the court." *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (*en banc*). When "intervening higher authority" is irreconcilable with a prior decision of this court, however, "a three-judge panel of this court . . . should . . . reject the prior opinion of this court as having been effectively overruled." *Id.* at 900. "Intervening higher authority" includes intervening *en banc* decisions. *See Cerrato v. San Francisco Cmty. College Dist.*, 26 F.3d 968, 972 n.15 (9th Cir. 1994) (intervening "*en banc* reversal" requires rejection of past decision); *United States v. Chhien*, 266 F.3d 1, 11 (1st Cir. 2001) (same). As we explain, we reject *Nelson* for precisely this reason.

[9]Section 10(j) of the Act provides:

The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to

in many respects similar to § 10(*l*), and noted that *both* sections are designed "to alleviate the threat that delay in the Board's processing of unfair labor practice complaints would otherwise pose to the NLRA's remedial goals." *Miller*, 19 F.3d at 455. Section 10(j), however, applies to any alleged unfair labor practice as to which the NLRB General Counsel has issued a complaint, while § 10(*l*) applies only to alleged violations of §§ 8(b)(4)(A), (B), or (C), 8(b)(7), or 8(e). *See* 29 U.S.C. §§ 160(j) & 160(*l*). Also, Board officials *must* petition for a § 10(*l*) injunction *whenever* it has " 'reasonable cause' to believe that specific violations of the NLRA (such as secondary boycotts and certain types of illegal picketing) have occurred." *Miller*, 19 F.3d at 455. (quoting 29 U.S.C. § 160(*l*)). No such mandatory obligation exists for § 10(j) injunctions; instead, the Board has discretion as to whether to seek pre-decision injunctive relief. *Id.* at 456. No reason occurs to us, however, why the distinction between a mandatory and discretionary application for an injunction should affect the courts' standard for determining whether to grant an injunction applied for, and the parties have suggested none.

There is one additional difference between § 10(j) and § 10(*l*) to which Overstreet would have us accord significance: Section 10(*l*) has "reasonable cause" language, while § 10(j) does not. This distinction, however, was noted in *Miller*, and its significance to the question at hand discounted. As *Miller* explained, § 10(*l*)'s "reasonable cause" language, which gave rise to the *Nelson* test, "has to do with the Board's

petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).

own obligations under the Act — not with a constraint on the equitable powers of the district court [to grant or deny an injunction] once its jurisdiction has been properly invoked." *Miller*, 19 F.3d at 456. In other words, the "reasonable cause" language is simply a "hurdle for the Board to jump over before petitioning the court for interim relief." *Id.*

*Miller's* description of "reasonable cause" as governing the *administrative* decision to petition for injunctive relief, not the judicial decision whether to grant it, reflects the plain language of § 10(*l*). That statute refers to "reasonable cause" as a consideration that an NLRB official must make: "If, after such [preliminary] investigation, the *officer or regional attorney* to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall" file a petition seeking an injunction against the suspected unfair labor practice. 29 U.S.C. § 160(*l*) (emphasis added). This language says nothing about how a district court should evaluate the petition once filed. Regarding judicial consideration of such petitions, §§ 10(j) and 10(*l*) are identical: Both state that a district court "shall have jurisdiction to grant" injunctive relief "as it deems just and proper." §§ 160(j) & (*l*).[10]

**[3]** Accordingly, we hold that after *Miller*, the *Nelson* "reasonable cause" test no longer applies. Rather, the "reasonable

---

[10]Overstreet's argument against applying *Miller* to § 10(*l*) relies on pre-*Miller* or out-of-circuit cases. Since we decided *Miller*, only one circuit appears to have issued an opinion regarding a § 10(*l*) injunction in line with the "not insubstantial and frivolous" test of *Nelson*. *See Pye v. Teamsters Local Union 122*, 61 F.3d 1013, 1020 (1st Cir. 1995) (instructing courts to determine if NLRB Regional Director has met "modest" burden imposed by "reasonable cause" provision). Some earlier cases in other circuits were also consistent with *Nelson's* reasonable cause standard. *See, e.g.*, *Kinney v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 994 F.2d 1271, 1278 (7th Cir. 1993) (applying "narrow" reasonable cause inquiry). As *Miller* makes *Nelson* inapplicable here, it also makes cases consistent with *Nelson's* approach inapplicable.

cause" language sets a standard Board officials must meet before petitioning courts for an injunction. Courts, in contrast, are to evaluate those petitions using the "just and proper" standard.

## B. *Miller* and "just and proper"

As noted, § 10(j), the statute at issue in *Miller*, and § 10(*l*), the statute at issue here, include the same "just and proper" language governing a district court's determination whether to issue an injunction. When the same language occurs in two closely related sections of a single statute, it strongly suggests that the language has the same meaning in both sections. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 260 (1993). Additionally, *Miller's* description of the two provisions' similar purpose, *see* 19 F.3d at 455, suggests that "just and proper" has the same meaning in both provisions. We see no reason why *Miller* should not govern with regard to the application of the "just and proper" standard under § 10(*l*), just as it does under § 10(j), and conclude that it does.

Under *Miller*, the "just and proper" standard invokes the same "equitable" standards "conventional[ly]" applied in preliminary injunction cases generally. *Id.* at 458 (" '[J]ust and proper' is another way of saying 'appropriate' or 'equitable.' "). As such, the "just and proper" standard "reflects an intention that the district court will exercise judgment rather than simply sign off on Board requests."[11] *Id.*

[4] District courts exercise discretion regarding preliminary injunctions by focusing on a familiar set of four equitable factors: the movant's likelihood of success on the merits; the possibility of irreparable injury to the moving party; the extent to which the balance of hardships favors each party;

---

[11]This holding expressly rejected an argument to the contrary that the NLRB made in reference to both § 10(j) and § 10(*l*), *see Miller*, 19 F.3d at 458, further confirming that *Miller's* holding applies in this case.

and whether the public interest will be advanced by granting the preliminary relief. *See id.* at 456. Under our preliminary injunction precedents, a moving party must show either "a combination of probable success on the merits and the possibility of irreparable harm" or "serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits." *Id.* (citing *Senate of Cal. v. Mosbacher*, 968 F.2d 974, 977 (9th Cir. 1992)). At "an irreducible minimum, the moving party must demonstrate a fair chance of success on the merits." *Id.* at 460 (quotation and citation omitted). As *Miller* holds that these standards apply under § 10(j) and we have concluded that *Miller* governs here, these same general standards apply, as "an irreducible minimum," to requests for § 10(*l*) injunctions.

To say that *Miller* applies to this case does not, however, fully delineate the applicable standards for judging the propriety of the requested interim relief in this case. *Miller* stated that when, as is usually the case, the NLRB's ultimate "determination on the merits will be given considerable deference," the district court in a § 10(j) proceeding "should evaluate the probabilities of the [General Counsel] prevailing in light of the fact that ultimately, the Board's determination on the merits will be given considerable deference." *Id.* On that basis *Miller* concluded that "the Board can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory," and, if likelihood of success is thus established, "presume irreparable injury" to the Board. *Id.*

As we explain later, however, because of the First Amendment backdrop in this case, ordinary principles of deference to Board interpretation of the Act do not apply here.[12] The

---

[12]As noted, the Carpenters appealed the ALJ ruling against them to the NLRB. We have no means of determining what the Board will decide in this case. That the General Counsel issued a complaint and an ALJ ruled in favor of the General Counsel by no means foreordains the Board's deci-

logical derivative of the *Miller* principle that likelihood of success should be adjudged *with* deference to the NLRB in mind where such deference will ultimately be applicable on the merits is the converse principle that, where, as here, judicial review of the NLRB's final decision will *not* incorporate the ordinary level of deference, the district court should

---

sion. *See* Richard B. Lapp, *A Call for a Simpler Approach: Examining the NLRA's Section 10(j) Standard*, 3 U.PA. J. LAB. & EMP. L. 251, 291 (noting that in cases involving petitions for injunctions, "it is not uncommon for the Board to overturn an ALJ decision that found in favor of the General Counsel") (quotation and citation omitted).

It is unclear whether *Miller's* incorporation of a deference principle applies in a § 10(*l*) case, because of a further difference between § 10(j) and § 10(*l*). The Board itself determines whether to file a § 10(j) petition, in its discretion. *See* 29 U.S.C. § 160(j); OFFICE OF GENERAL COUNSEL, NATIONAL LABOR RELATIONS BOARD, ELECTRIC REDACTED SECTION 10(J) MANUAL USER'S GUIDE 14 (2002), http://www.nlrb.gov/nlrb/legal/manuals/ Redacted%2010(J)%20Manual%205.0%20reduced.pdf (noting that NLRB staff may file a § 10(j) petition "[i]f the Board authorizes § 10(j) proceedings") (last visited 24 Apr. 2005). One might presume from the Board's decision to file a § 10(j) petition that if the facts are found to be as projected in the petition, the Board will decide the case consistently with the petition. In contrast, neither the statute nor the Board's own internal guidance specifies a role for the Board itself in deciding whether to file a § 10(*l*) petition. Instead, regional officers determine whether to file a § 10(*l*) petition "on behalf of the board." 29 U.S.C. § 160(*l*); *see also* OFFICE OF GENERAL COUNSEL, NATIONAL LABOR RELATIONS BOARD, 10200-10248 Statutory Priority: Sections 10(*l*) and 10(k)—CC, CD, CE, and CP Cases, http://www.nlrb.gov/nlrb/legal/manuals/SECTION%2010%20L%20 10200%2010248.pdf (instructing regional offices to, with General Counsel guidance, file § 10 (*l*) petitions as soon as reasonable cause is found, without reference to the Board) (last visited 24 Apr. 2005). The filing of a § 10(*l*) petition, unlike the filing of a § 10(j) petition, therefore, suggests nothing about how the Board will ultimately resolve the case.

As we hold that this case's First Amendment backdrop prevents us from taking into account any ultimate deference to the Board in reviewing Overstreet's application for § 10(*l*) relief, we need not determine whether or how we would generally apply, under § 10(*l*), *Miller's* comment regarding the significance in § 10(j) proceedings of future deference to the Board's ultimate position.

decide likelihood of success on legal issues as it would in a non-NLRB case, *without* factoring in any special NLRB deference.[13] While the "irreducible minimum," then, remains that Overstreet must establish a "fair chance of success on the merits," *Miller*, 19 F.3d at 460, the likelihood of success standard applicable to this case is somewhat higher than in *Miller*, as we do not assume deference to the Board's ultimate conclusion.

Although the district court erred by asking whether Overstreet had "reasonable cause" to file his petition rather than whether granting an injunction would be "just and proper," we need not remand for consideration under the correct standard. The "not insubstantial and frivolous" *Nelson* standard, 899 F.2d at 1560, is a significantly lower bar for Overstreet to meet than the "irreducible minimum" showing of a "fair chance of success on the merits," *Miller*, 19 F.3d at 460, especially as evaluated without any deference to the Board. Because the district court found that Overstreet failed to meet the *Nelson* standard, it necessarily found that Overstreet failed to meet the standard of likelihood of success applicable here. The upshot is that if we agree with the district court's assessment of the merits — as we do — then we must affirm.

---

[13]Further, where, as here, there is at least some risk that constitutionally protected speech will be enjoined, only a particularly strong showing of likely success, and of harm to the defendant as well, could suffice. *See Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) (noting the "significant public interest in upholding First Amendment principles," thus requiring an especially strong showing on other preliminary injunction prongs); *cf. San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1233-34 (9th Cir. 1997) (requiring particularly close review of preliminary injunction cases implicating the First Amendment "so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression") (internal quotation and citation omitted).

## III. Likelihood of success on the merits

The Carpenters maintains that its bannering is fully protected by the First Amendment, so that any injunction requiring them to take down the signs would be unconstitutional. If this contention is colorable — and we conclude that it is — then the deference courts owe to the Board with regard to the interpretation of the NLRA is at its nadir. We therefore begin by explaining why that is so. We next inquire into the strength of the Carpenters' First Amendment arguments. With the necessity for constitutional caution established, we then consider in detail why Overstreet has little likelihood — not even a "fair chance" — of succeeding in showing that § 8(b)(4)(ii)(B) prohibits the Carpenters' bannering activity.

### A. *Catholic Bishop*, *DeBartolo* & constitutional avoidance

[5] In interpreting the NLRA, as in interpreting other statutes, we must consider at the outset whether a proposed construction of the Act "would give rise to serious constitutional questions." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 501 (1979). "If so, we must first identify the affirmative intention of the Congress clearly expressed before concluding that the Act" creates a constitutional quandary. *Id.* (quotation omitted). It bears emphasis that in making this inquiry, we need not decide whether the First Amendment *does* protect the Carpenters' bannering, or even whether it probably does. Rather, "we make a narrow inquiry whether [granting Overstreet's request for an injunction] presents a significant risk that the First Amendment will be infringed." *Id.* at 502.

Our need to avoid creating a "significant risk" to the First Amendment affects both how we proceed to interpret the statute at issue and the degree to which we take into account Overstreet's view of the statute. "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid

such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("*DeBartolo*").[14] Moreover, because constitutional decisions are not the province of the NLRB (or the NLRB's Regional Director or General Counsel), the tasks of evaluating the constitutional pitfalls of potential interpretations of the Act and of interpreting the Act to avoid those dangers are committed *de novo* to the courts. *Cf. id.* at 574-75 (refusing to accord deference to the NLRB's interpretation of § 8(b)(4) because of need to avoid First Amendment concerns absent clear congressional intent).

In *DeBartolo*, the NLRB had interpreted the Act to prohibit union handbills urging customers to avoid patronizing a mall, because one of the mall's tenants was using a non-union contractor to build its store. *Id.* at 570. After considering at some length, but not deciding, the union's free speech arguments, the Court concluded that adjudicating the assertions "would require deciding serious constitutional issues." *Id.* at 576. The Court therefore went on to "*independently* inquire whether there is another interpretation, not raising these serious constitutional concerns, that may fairly be ascribed to § 8(b)(4)(ii)(B)." *Id.* at 577 (emphasis added).

In addition to affecting the degree of deference accorded the Board, the underlying free speech issues influenced the Court's decision in *DeBartolo* in a second way: Because of the constitutional concerns, the Court went on to interpret § 8(b)(4)(ii)(B) narrowly, holding that the statute's " 'nonspecific, indeed vague' " terms — providing that unions may not "threaten, coerce, or restrain any person," 29 U.S.C.

---

[14]*DeBartolo* reached the Supreme Court twice. *See Edward J. DeBartolo Crop. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988); *Edward J. DeBartolo Corp. v. NLRB*, 463 U.S. 147 (1983). Because we refer only to the Court's second opinion in this case, we do not differentiate between the Court's first and second opinions.

§ 158(b)(4)(ii)(B) — "should be interpreted with 'caution' and not given a 'broad sweep.' " *DeBartolo*, 485 U.S. at 578 (quoting *NLRB v. Drivers*, 362 U.S. 274, 290 (1960)); *see also BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 535-36 (2002) (describing *DeBartolo* as case in which Court found that "the statutory provisions and their legislative history indicate[ ] no clear intent to reach" the asserted unfair labor practice and so "simply read the statute not to cover it, thereby avoiding the First Amendment question altogether") (citing *DeBartolo*, 485 U.S. at 578-88).[15]

Applying these precepts, we turn first to the question whether interpreting the Act to prohibit the Carpenters' bannering activity would pose a "significant risk" of sanctioning a violation of the First Amendment. *Catholic Bishop*, 440 U.S. at 502. If so, then the position of the NLRB is not entitled to special consideration. *DeBartolo*, 485 U.S. at 574-75. Instead, in that circumstance, the Carpenters could be held to have committed an unfair labor practice only if the statute *clearly* prohibits the union's conduct. *BE&K Constr.*, 536 U.S. at 535-36. Overstreet has no "fair chance" of so demonstrating. *Miller*, 19 F.3d at 456.

## B.    Secondary picketing and the First Amendment

The Supreme Court has addressed the interaction between the First Amendment and § 8(b)(4)(ii)(B) most directly in two cases, *NLRB v. Retail Store Employees Union, Local 101*, 447 U.S. 607 (1980) ("*Safeco*"), and *DeBartolo*.[16] In *Safeco*,

---

[15]*BE&K* applied this rule to another portion of the statute, refusing to read § 8(a)(1) so broadly as to create constitutional questions about its application to the pursuit of non-frivolous lawsuits. Nothing in the statute suggested that it "must be read" to reach such actions, the Court concluded. 485 U.S. at 536.

[16]The Supreme Court's approach to the interaction between the First Amendment and 8(b)(4)(ii)(B) accords with its treatment of the Amendment's interaction with other portions of the Act. *See BE&K*, 536 U.S. at 535-36 (considering impact on the First Amendment's right to petition in rejecting an interpretation of § 8(a)(1) that would have prohibited pursuit of non-frivolous lawsuits as retaliation for union organizing efforts).

unions having a labor dispute with an insurance company picketed outside insurance agencies that sold that company's insurance policies, urging customers to boycott those policies. *Id.* at 609. The Court held that § 8(b)(4)(ii)(B) prohibited the union's picketing, but gave varying explanations for why this prohibition did not infringe on the union's free speech rights.

Justice Stevens' *Safeco* concurrence, rather than Justice Powell's plurality opinion, provided the rationale for prohibiting secondary picketing consistent with the First Amendment that a majority of the Court eventually adopted. Picketing is susceptible to constitutional regulation, Justice Stevens wrote, because it "is a mixture of conduct and communication. In the labor context, it is the conduct element rather than the particular idea being expressed that often provides the most persuasive deterrent to third persons about to enter a business establishment." *Safeco*, 447 U.S. at 619 (Stevens, J., concurring). The physical conduct of picketing "involves *patrol* of a particular locality" and the mere "presence of a picket line" induces certain actions — namely, refusing to cross that line. *Id.* (emphasis added, quotation and citation omitted).

**[6]** The *DeBartolo* Court adopted and elaborated upon Justice Stevens' explanation. *DeBartolo* noted that "picketing is qualitatively different from other modes of communications," 485 U.S. at 580 (quotation and citation omitted); stated that the picketing in *Safeco* "actually threatened the neutral with ruin or substantial loss," *id.*; and cited Justice Stevens' conduct/communication distinction. *Id.* Applying Justice Stevens' explanation to the facts of *DeBartolo*, which involved union members distributing handbills "without any accompanying picketing or patrolling," *id.* at 571; *see also id.* at 575-76, the Court concluded that because distributing handbills was "mere persuasion," not "intimidat[ion] by a line of picketers," prohibiting handbilling would raise constitutional concerns of considerably greater gravity than limiting picket lines. *Id.* at 580.

The handbills in *DeBartolo*, like the handbills here, contained a more complete argument favoring the union's position than do banners. The banners in this case, for example — as is true of signage, including billboards, generally — contain only catchy shorthand, not discursive speech. This pithiness, however, does not remove the banners from the scope of First Amendment protections, as cases regarding well-known short slogans demonstrate. *See, e.g., Cohen v. California*, 403 U.S. 15, 25-26 (1971) (applying ordinary First Amendment principles to t-shirt slogan reading "Fuck the draft"); *Cochran v. Veneman*, 359 F.3d 263 (3d Cir. 2004) (applying ordinary First Amendment principles to two-word billboards: "got milk?").

**[7]** Recognizing that billboards and signs are generally accorded full First Amendment protection, the Carpenters' argument is that a few union members holding a banner visible from a store's entrance is far more like the "mere persuasion" of *DeBartolo* than the "intimidation by a line of picketers" in *Safeco*, and is therefore constitutionally protected. Just as *DeBartolo* did not rule on the constitutional question raised there, *see* 485 U.S. at 576-78 (discussing constitutional issues raised and noting statutory interpretations that avoided the need to decide those issues), we do not rule on the Carpenters' First Amendment argument. Instead, it is sufficient to recognize that the argument is a plausible, and quite possibly meritorious, one.

As in *DeBartolo*, the Carpenters' bannering does not involve patrolling in front of an entrance way and therefore erects no symbolic barrier in front of the Retailers' doorways. Nor did the Carpenters place their banners so as to create any physical barrier blocking the entrances to the Retailers or the walkways approaching those entrances. Nor is there anything about the Carpenters' members' behavior that could be regarded as threatening or coercive — no taunting, no massing of a large number of people, no following of the Retailers' patrons.

That the union members are physically present, holding up the banner, does not affect this conclusion. The handbillers in *DeBartolo* were also on the scene, able to communicate by their presence some greater degree of moral suasion, perhaps, than the words on their pamphlets standing alone. The one-on-one approach of handbillers, indeed, provided an opportunity for verbal interchange concerning the fervency of the union members' belief and may have generated some degree of reluctance by prospective customers to defy their requests, for fear of moral disapproval.

More generally, First Amendment jurisprudence establishes that individuals ordinarily have the constitutional right to communicate their views in the presence of individuals they believe are engaging in immoral or hurtful behavior. "[P]eaceful and truthful discussion" designed to convince others not to engage in behavior regarded as detrimental to one's own interest, or to the public interest, is fully protected speech. *Thornhill v. Alabama*, 310 U.S. 88, 104 (1940); *see also City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (holding that "the First Amendment protects a significant amount of verbal criticism and challenge" in speech aimed at physically present public officials about to engage in challenged behavior). The protection of on-site speech extends to the "emotive impact of speech on its audience," *Boos v. Barry*, 485 U.S. 312, 321 (1988) (opinion of O'Connor, J.), including the Carpenters' invocation of "shame" on the protested retailers and, by extension, on members of the public who patronize them. *See also Cohen*, 403 U.S. at 26 (noting that "words are often chosen as much for their emotive as their cognitive force," and that such language choices do not diminish First Amendment protections).

**[8]** We conclude that interpreting § 8(b)(4)(ii)(B) to prohibit the Carpenters' activity would pose a "significant risk" of infringing on First Amendment rights. We will analyze the statutory question accordingly, without deference to the Regional Director's position.

## C. Section 8(b)(4)(ii)(B) and the Carpenters' bannering

[9] A § 8(b)(4)(ii)(B) violation has two elements. First, a labor organization must "threaten, coerce, or restrain" a person engaged in commerce (such as a customer walking into one of the secondary businesses). 29 U.S.C. § 158(b)(4)(ii). Second, the labor organization must do so with "an object" of "forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the produces of any other producer, processor, or manufacturer, or to cease doing business with any other person." 29 U.S.C. § 158(b)(4)(ii)(B). As the district court noted, the Carpenters conceded "that the goal of its activities is to dissuade consumers from patronizing the [Retailers]," which necessarily had the goal of encouraging the Retailers to "cease doing business" with Brady, Precision, and E&K. We therefore focus on the "threaten, coerce, or restrain" portion of § 8(b)(4)(ii).

The legislative text, as *DeBartolo* noted, is vague. It is far from self-evident that "to threaten, coerce, or restrain" encompasses the bannering activity at issue here. Nor does the legislative history of the relevant amendment to this text, passed in 1959, indicate a "clear intent," *BE&K Constr.* Co., 536 U.S. at 535, to bar this activity. The only activity that appears to be clearly proscribed by the statute is "*ambulatory* picketing" of secondary businesses. *DeBartolo*, 485 U.S. at 587 (emphasis added).

Senator John F. Kennedy, the Chairman of the House-Senate Conference Committee debating the 1959 NLRA amendments at issue in this case, explained the conference agreement:

> We were not able to persuade the House conferees to permit picketing in front of that secondary shop, but we were able to persuade them to agree that the union shall be free to conduct informational activi-

ties short of picketing. In other words, the union can hand out handbills at the shop, can place advertisements in the newspapers, can make announcements over the radio, and can carry on *all publicity short of having ambulatory picketing in front of a secondary site*.

105 Cong. Rec. 17,898-99 (1959) (emphasis added) (cited in *DeBartolo*, 485 U.S. at 586-87). Senator Kennedy spoke in reference to the proviso added to § 8(b)(4) in 1959, but the Supreme Court has held that the proviso and its legislative history is "a clarification of the meaning of § 8(b)(4)" as a whole. *DeBartolo*, 485 U.S. at 586; *see also NLRB v. Servette, Inc.*, 377 U.S. 46, 53 n.9 (1964) (relying on Senate colloquy involving Kennedy as illustrative of legislative history of 1959 amendments).

Senator Kennedy's understanding is, of course, not the last word on the legislative intent of the relevant statutory provision, but his role as Conference Committee Chairman, *see DeBartolo*, 485 U.S. at 586, is sufficiently important to the passage of this provision that his understanding, explained to the Senate, is a useful tool in determining what the Senate intended when it passed this provision. *See Bd. of Governors v. Inv. Co.*, 450 U.S. 46, 74-75 (1981) (according special weight to relevant committee chairman's statements on Senate floor); *see also*, *Conroy v. Aniskoff*, 507 U.S. 511, 521-22 (1993) (Scalia, J., concurring) (according special weight to statements by relevant committee chairmen when analyzing legislative history). Given Senator Kennedy's understanding that *only* "ambulatory picketing" would be prohibited, the legislative history "falls far short of revealing a clear intent" that bannering activity is always prohibited by § 8(b)(4)(ii)(B). *See* 485 U.S. at 588.[17]

---

[17]Opponents of the amendment did suggest that it would have a broader scope, prohibiting "not only picketing but leaflets, radio broadcasts, and newspaper advertisements." 105 Cong. Rec. 15,540 (1959). The Supreme

Senator Kennedy's focus on "ambulatory picketing" reflects the traditional identification of the factors that distinguish picketing from other protest actions: Classically, picketers *walk* in a line and, in so doing, create a symbolic barrier. *See, e.g., Honolulu Typographical Union No. 37 v. NLRB*, 401 F.2d 952, 953-54 (D.C. Cir. 1968) (*Hawaii Press Newspapers, Inc.*) (describing how thirty to sixty union members walked "shoulder to shoulder" in an oval in front of picketed businesses' entrances). In contrast, bannering involves no walking, in line or otherwise, of union members.

**[10]** In the absence of any clear basis for construing § 8(b)(4)(ii)(B) as covering bannering generally, Overstreet can prevail only if the Carpenters' actions in particular were sufficiently "intimidat[ing]," *DeBartolo*, 485 U.S. at 580, to "threaten, coerce or restrain" potential customers of the Retailers. That there have been no threats, and no physical barriers or other "restraints" is not in dispute. Overstreet contends, however, that the Carpenters' banners "coerce," for two reasons: first, because they are equivalent to picketing in their impact on viewers, and, second, because they contain fraudulent language that misleads the public into thinking that the Carpenters has a primary dispute with the Retailers. We address each contention in turn, concluding that Overstreet does not have a fair chance of success with these arguments.

### 1. Picketing

The Carpenters placed their banners on public sidewalks, at locations which both provided the greatest exposure to pass-

---

Court, however, expressly rejected this interpretation of § 8(b)(4)(ii), noting that the views of opponents to a statute "are not persuasive" indications of the statute's meaning. *DeBartolo*, 485 U.S. at 584-85; *see also NLRB v. Fruit & Vegetable Packers, Local 760*, 377 U.S. 58, 65-67 (1964) (noting that proponents of 1959 amendments did not "refer[ ] to consumer picketing as making the amendments necessary" and finding "[t]he silence of the sponsors . . . pregnant with significance").

ing motorists and ensured that little physical interaction occurred between customers and the union members holding up the banners. The banners are so situated as to avoid blocking entrances to Retailers' places of business or otherwise promoting physical confrontations between union members and individuals seeking to enter those places of business. The Carpenters do not patrol the area around their banners; their activity is thus not "ambulatory," but stationary. *See DeBartolo*, 485 U.S. at 587. Nor do the union members standing by the banners initiate any verbal or physical interactions with the public.

Overstreet argues that the Carpenters' conduct, peaceful and passive though it is, "intimidate[s]" individuals from entering the Retailers, *see id.* at 580, and therefore "coerces" within the meaning of the statute. He cites NLRB cases for the proposition that "the posting of one or more individuals at entrances to a place of business" is the key criterion in determining whether union members are picketing rather than engaging in protected speech, thereby "coercing" within the meaning of § 8(b)(4)(B).

Overstreet, however, *only* cites NLRB cases, not court cases. S*ee*, *e.g., Mine Workers Dist. 2 (Jeddo Coal Co.)*, 334 NLRB 677 (2001). As *DeBartolo* indicates, the NLRB's determination of the reach of § 8(b)(4) is not entitled to the usual deference accorded the agency, because the statutory question must be answered with awareness of the line between constitutionally-protected speech and unprotected activity. *See* 485 U.S. at 574-75. The cases cited by Overstreet never analyze the First Amendment implications of their statutory analyses. *See Jeddo Coal Co.* In particular, the reliance on the physical presence of speakers in the vicinity of the individuals they seek to persuade, as we have discussed, is a consideration that, standing alone, is no basis for lowering the shield of the First Amendment or turning communication into statutory "coercion." *DeBartolo* so confirms: The handbillers

in *DeBartolo* were very much on the scene, "[a]t all four entrances" to the shopping center. *DeBartolo*, 485 U.S. at 571.[18]

[11] Nor are the union members' activities "coercive" for any reason *other* than their physical presence. The union members simply stood by their banners, acting as human signposts. Just as members of the public can "avert [their] eyes" from billboards or movie screens visible from a public street, they could ignore the Carpenters and the union's banners. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 211 (1975) (quoting *Cohen*, 403 U.S. at 21). If anything, the Carpenters' behavior involved *less* potential for "coerc[ing]" the public than the handbilling in *DeBartolo*, as there was no one-on-one physical interaction or communication. In short, the Carpenters' activity cannot be described as "*ambulatory* picketing," *DeBartolo*, 485 U.S. at 587 (emphasis added), nor does it, any more than handbilling, have any other characteristic that clearly "threatens, restrains, or coerces" those who see the communication.

Overstreet alternatively argues that the Carpenters' conduct amounts to "signal picketing," and is thus both barred by the Act and not protected by the First Amendment. Overstreet misunderstands the nature and significance of "signal picketing."

---

[18]Overstreet cites, in addition to the NLRB "posting" cases, court cases that are not helpful. Some of those cases involve either more traditional ambulatory picketing activities, *see, e.g., Hawaii Press Newspapers, Inc.*, 401 F.2d 952 (D.C. Cir. 1968), or other activities that were deemed picketing only in conjunction with more traditional ambulatory picketing. *See, e.g., Laborers Local 389 (Calcon Construction)*, 287 NLRB 570 (1987). Others are pre-*DeBartolo* and *Catholic Bishop* decisions that assert without explanation that certain activities were "more than speech" and defer to NLRB interpretations despite the First Amendment vacuum in the NLRB analysis. *See, e.g., NLRB v. Local 182, Int'l Bhd. of Teamsters*, 314 F.2d 53, 58 (2d Cir. 1963). For the reasons indicated, none of these cases are in conflict with our analysis.

The "signal" in signal picketing is an implicit instruction to other union members, including union employees of secondary businesses, eliminating the need for the signaling union officials to make their direction explicit.[19] Free speech protections do "not apply to a mere signal by a labor organization *to its members, or to the members of its affiliates*, to engage in an unfair labor practice such as a strike proscribed by § 8(b)(4)(A)." *NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 690 (1951) ("*Denver Bldg. Trades*") (emphasis added); *see also Local No. 274, United Assoc. of Journeymen. (Indus. Prods. Group, Stokely-Van Camp, Inc.)*, 267 NLRB 1111, 1114 (1983) (describing a "signal" to employees of secondary business). The reason is that the implicit direction is understood by union employees to be embedded in a context involving *more* than mere speech. The failure of a union member to comply could lead to formal union discipline or informal sanctions by other union members. *See San Francisco Local Joint Exec. Bd. of Culinary Workers (McDonald's Sys.)*, 203 NLRB 719, 728 (1973) (describing signal picketing as "backed by group discipline"). The entire concept of signal picketing thus depends on union employees talking to *each other*, not to the public. In other words, "signals," in this context, are "official *directions or instructions* to a union's own members," implicitly backed up by sanctions. *Denver Bldg. Trades*, 341 U.S. at 691 (emphasis added, quotation and citation omitted).

It is the mutual understanding among union employees of the meaning of these signals and bonds, based on either affinity or the potential for retribution, that makes these "signals"

---

[19]We once, in passing, described "signal picketing" in broader terms — as "activity . . . which acts as a signal to neutrals that sympathetic action on their part is desired by the Union." *Int'l Assoc. of Bridge, Structural & Ornamental Iron Workers v. NLRB*, 598 F.2d 1154, 1158 n.6 (9th Cir. 1979). In context, however, the "neutrals" were not just any members of the public but "*employees* of neutral employers. *Id.* at 1160 (emphasis added). *Int'l Assoc.* had no reason to address picketing addressed to the public or to consumers, and we do not understand it to have done so.

sufficiently coercive to fall within the meaning of § 8(b)(4)(ii). To broaden the definition of "signal picketing" to include "signals" to *any* passerby would turn the specialized concept of "signal picketing" into a category synonymous with *any* communication requesting support in a labor dispute. If "signal picketing" were defined so broadly, then the handbilling in *DeBartolo* would have been deemed signal picketing. The one-on-one interaction of handbilling could communicate *more* easily than the presence of union members holding a banner at some distance from passing pedestrians the union's do-not-patronize request. Indeed, in *DeBartolo*, the union did more than implicitly signal a request that the consumers not deal with the offending shopping center; the union's handbills made that request explicitly.

In short, like other words and phrases developed in the world of labor relations, *see, e.g., Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin*, 418 U.S. 264, 283 (1974) (observing how "scab" has become "common parlance in labor disputes"), "signal picketing" is a term of art with a specific meaning in a labor relations context. The term has no useful application here, as the banners were placed so a wide segment of the public — especially passing motorists — would see them, and were not directed at employees. Attaching the term "signal picketing" to the union's behavior in this case is inaccurate and, as such, not pertinent to the legal analysis.

**[12]** In sum, we hold that Overstreet does not have a "fair chance" of establishing that the Carpenters' bannering activity is traditional picketing or "signal picketing," and therefore a "threat," "restraint," or "coercion" within the meaning of § 8(b)(4)(ii)(B).

### 2. *Fraudulent language*

Overstreet's second submission is that, "picketing" aside, the phrase "labor dispute," placed on a banner with *only* the

name of a Retailer on it is "fraudulent," because it suggests to the public that the Carpenters has a primary labor dispute with the Retailers rather than with Brady, Precision, and E&K. The district court disagreed, ruling that because the Carpenters union believes that the Retailers' decision to do business with Brady, Precision, and E&K contributes to the erosion of labor standards, the union does, in fact have a "labor dispute" with the Retailers. Whatever difference there may be in labor law between a primary and a secondary labor dispute, the difference, the district court concluded, would not mean much to most consumers. Consequently, use of the term "labor dispute" was not a false statement, and the Carpenters had no obligation to specify on their banners that they referred only to a secondary labor dispute.

We agree with the district court for three reasons.

*First*, although Overstreet argues that "the most natural reading" of the Carpenters' banners is that the union has a *primary* labor dispute with the Retailers, the primary/secondary distinction is the stuff of labor law treatises, not of common parlance. Telling in this regard is the language Overstreet uses: He asserts in his petition that the Carpenters posted the banners "in the absence of any bona fide *primary* labor dispute," (emphasis added), and goes on to repeat this locution, stating, for instance, that "the Union did not have a *primary* labor dispute with [the Retailers]." (emphasis added). That the Regional Director needs to use the term "*primary* labor dispute," (emphasis added), to make his point illustrates well that, even to labor law aficionados, the term "labor dispute," standing alone, is not limited to primary disputes.

[13] Contrary to Overstreet's assertion that "it is irrelevant that the Union actually may have had a secondary labor dispute" with bannered employers, the presence of *any* labor dispute is determinative of the question whether the Carpenters' assertion of a "labor dispute" was misleading to the public. Disputes, labor and otherwise, commonly spill over to affect

secondary institutions, as individuals with strong opinions concerning the dispute seek to convince those with some prospect of influencing the outcome of the dispute to do so. Clothing manufacturers allegedly operate sweatshops, and activists protest institutions that buy clothing from those manufacturers. *See, e.g.*, United Students Against Sweatshops: About Us, http://www.studentsagainstsweatshops.org/about/about.php (last visited 25 Apr. 2005) (asserting goal of changing universities' standards for labor conditions in which university clothing is made). A nation takes controversial political or military actions, and activists pressure universities and other institutions to divest endowment or other funds from businesses supporting those actions. *See, e.g.,* Divest from Israel Campaign, http://www.divest-from-israel-campaign.org (last visited 25 Apr. 2005) (urging institutions to divest from certain companies doing business with the state of Israel and suggesting that failure to do so makes one "complicit" in alleged wrongs committed by Israel).

Whatever one might think about the merits of these disputes, all parties involved understand that a dispute does exist between activists and the "secondary" institutions. There is likely to be disagreement, true, over whether the secondary is contributing to the primary's actions in any significant way, or whether the primary's actions are objectionable at all. But any such disagreement does not affect whether, in common parlance, a "dispute" exists concerning maintaining ties with an individual or institution taking controversial action. And, when the specific dispute is whether the secondary institution should sever ties with another company so that the secondary institution does not undermine regional labor standards, "labor dispute" is a perfectly apt description.

The response of one of the Retailers — Artisan Homes, Inc., a Phoenix-area real estate developer — confirms that it did, in fact, have a labor dispute with the Carpenters. In response to the Carpenters' "SHAME ON ARTISAN HOMES, INC." sign near their work site, Artisan put up its

own banner at that same site, less than 100 feet away from the Carpenters' banner, reading "We Support Our Subcontractors! It's a Right to Work State . . . Shame on Carpenters Local Union 1506." Quite clearly, Artisan disagreed with the Carpenters concerning whether a non-union subcontractor deserved "support." In other words, Artisan and the Carpenters were engaged in a "dispute" about a "labor" issue.

**[14]** This understanding of the term "labor dispute" distinguishes this case from *San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230 (9th Cir. 1997), in which we affirmed the grant of an injunction preventing union members from holding signs outside of a hospital that read "THIS MEDICAL FACILITY IS FULL OF RATS." Members of the public, we held, would "natural[ly] read[ ]" those signs to assert, falsely, "that the Hospital has a rodent problem," *Id.* at 1236, not with the specialized meaning "rat" has in the context of a labor dispute. *Id.* In the present context, precisely because members of the public are not familiar with the specialized use of language in the labor context, they would naturally read "labor dispute" as meaning simply that a union had a dispute with the Retailer, which is perfectly true.[20]

*Second*, if one *were* uncertain about the meaning of the term "labor dispute" in the labor context, one would most likely turn to federal labor statutes for illumination. And the NLRA itself confirms that, even to those in the know, "primary" labor disputes are a subset of "labor disputes," not the entire category.

---

[20]Although the dissent rests its argument on *San Antonio Community Hospital*, it fails to note that the injunctive relief in that case was based solely on defamation causes of action. 125 F.3d at 1235. We therefore had no occasion to consider whether fraudulent speech, without more, can amount to a "threat," "restraint" or "coercion" within the meaning of § 8(b)(4)(ii) of the NLRA. Although the concepts of fraud and misrepresentation, on the one hand, and threats, restraints, and coercion, on the other, appear quite separate, we have no occasion in this case either to decide whether false speech, without more, can violate § 8(b)(4)(ii)(B), as we conclude that no such speech occurred here.

The Act defines a "labor dispute" to

> include[ ] any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 152(9). This definition does not specify *whose* employment may the subject of a labor dispute. Rather, it uses broader phrases, encompassing *any* dispute about the union status of any set of employees.

This understanding of the Act's definition of "labor dispute" accords with judicial interpretations of the Norris-LaGuardia Act's definition of the same term. The Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*, defines "labor dispute" with terms identical in all relevant respects to the Act's definition.[21] *Compare* 29 U.S.C. § 113(c) *with* § 152(9). We have previously held that a secondary boycott "involves a labor dispute" for Norris-LaGuardia Act purposes. *Smith's Mgmt. Corp. v. Int'l Bhd. of Elec. Workers, Local Union No. 357*, 737 F.2d 788, 790 (9th Cir. 1984); *see also Burlington N. Santa Fe Ry. Co. v. Int'l Bhd. of Teamsters, Local 174*, 203 F.3d 703, 711 (9th Cir. 2000) (*en banc*).

**[15]** In this case, the Carpenters believes that the Retailers'

---

[21]The Norris-LaGuardia Act defines a "labor dispute" to

> include[ ] any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 113(c).

decision to work with Brady, Precision, and E&K interfered with their efforts to "arrange terms or conditions of employment" with those three contractors. Their dispute with the Retailers therefore fits squarely within the NLRA's, and the Norris-LaGuardia Act's, definition of "labor dispute."

**[16]** *Third*, issuing a *preliminary* injunction against speech based on its falsity would create particularly significant risks to the First Amendment. While "[t]he First Amendment does not protect fraud," *San Antonio Cmty. Hosp.*, 125 F.3d at 1239, an injunction issued "before an adequate determination that it is unprotected by the First Amendment" presents the "special vice of a prior restraint." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973); *see also Kramer v. Thompson*, 947 F.2d 666, 675-76 (3d Cir. 1991) (*en banc*) (concluding that an injunction against future speech ceases to be an unconstitutional prior restraint once it *is* determined that the enjoined speech is libelous and beyond the First Amendment's protections). Section 10(*l*) injunctions, by definition, are issued *before* either the Board or any federal court has made such an "adequate determination," and so amount to a preliminary prior restraint on the Carpenters' speech. A "heavy presumption" exists against finding such prior restraints constitutionally permissible. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1961). Against that background, if we did harbor any doubts concerning whether the Carpenters' banners are fraudulent — which we do not — those doubts would have to be resolved against such a finding at this preliminary stage.

**[17]** We conclude that the Carpenters' banners did not contain false assertions and, therefore, were not fraudulent.

## CONCLUSION

Applying the *Miller* "just and proper" test, we conclude that Overstreet did not establish a fair chance of success on the merits. Overstreet's legal theory is weak, given the sta-

tionary, non-interactive and truthful nature of the Carpenters' bannering activity. In light of the First Amendment concerns present in this case, we find that Overstreet did not show a fair chance of proving that the Carpenters' bannering is within the scope of the "threaten, coerce, or restrain" language of § 8(b)(4)(ii).

AFFIRMED.

---

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent.

The NLRB regional director has a sufficient likelihood of prevailing on the "fraudulent speech" claim, under our decision in *San Antonio Community Hospital v. Southern California District Council of Carpenters*,[1] so that he should have been granted a preliminary injunction based on the Administrative Law Judge's findings and decision.

The record has photographs of the banners at issue. A typical one says "LABOR DISPUTE" twice, and in huge red letters, "SHAME ON THE WESTIN BONAVENTURE." Anthony's Fish Grotto got its own special banner, which had "LABOR DISPUTE" printed twice, and then the individualized message "DON'T EAT AT ANTHONY'S FISH GROTTO."

Many people, because of their sympathies or their obligations as union members, will not patronize firms whose employees are engaged in disputes over union recognition or terms of employment. Such individuals, seeing the "SHAME ON THE WESTIN BONAVENTURE" banner, for example,

---

[1]*San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230 (9th Cir. 1997).

would be inclined to schedule conventions, dinners, weddings and other events at a different hotel. They would also likely avoid staying at the Westin. According to deposition evidence in the record, one of the hotels subjected to the banner lost a Teamsters' Convention because of the banners in front. When higher officials of the Teamsters arrived before the entire group, they "were quite aggravated and upset," and their convention planner cancelled the convention, a day after it was supposed to start.

The huge banners are displayed to people driving by. Handbills tell readers that E & K Arizona was a subcontractor for a contractor hired to do work by the firm where the banner is displayed, but a person had to approach a union representative and ask for a handbill to learn that. Evidently the firms subjected to the banners did not even hire E & K Arizona. No one driving by would get the explanatory handbill, or see anything explaining that the union's dispute was with another firm entirely and not the firm upon whom the banner invoked "shame." The union continued to post its banners long after the firms that contracted with E & K Arizona had finished their work and left, so the banners and their "shame" message were present even when there was no work going on at the sites to which the union had any objection.

The Administrative Law Judge made a finding of fact that "[t]he only message the banners could reasonably have conveyed to viewers, including customers, suppliers, and visitors of the targeted employers or persons, was that Respondent Unions had primary labor disputes with the neutrals named on the banners." The union "must have foreseen that misconceptions would be the consequence of their bannering," and "most banner viewers did not, and were not intended to, read the handbills," which were distributed on the street only to people who approached the union representatives and asked for them. The union "had the intent and purpose," the Administrative Law Judge found, "of causing the targeted neutral employers or persons so much discomfiture through customer,

supplier, or visitor complaints, inquiries, criticism, or with-held business that the neutral employers or persons would either cease doing business with the primary employers or influence other neutral employers or persons to cease doing business with the primary employers."

The majority adopts the district court's reasoning that the union had a sort of philosophical dispute with companies that did business with other companies that then did business with yet other companies with which the union actually had a dis-pute. The argument is that the public cannot be expected to understand the fine distinctions between primary and second-ary labor disputes. I think that is true, but it cuts the other way. The public cannot be expected to imagine what the union's real dispute is, when it invokes "SHAME" because of a "LABOR DISPUTE" on companies who are contractually two steps removed from the company from which the union is actually seeking benefits for its members. A reasonable per-son driving by the Westin Bonaventure or the other firms sub-jected to the banners would think "that company must not be treating its employees right," not "that company must be deal-ing with other companies that deal with yet other companies that don't treat their employees right."

We need not even reach the question whether the banners are "picketing," because we are obligated to follow our deci-sion in *San Antonio Community Hospital*. In that case, the car-penters union displayed a banner in front of a hospital saying that the hospital was "full of rats," to advance its position in a dispute with a construction company that was working on a hospital expansion project.[2] The union had an innocent explanation — that "rats" in labor parlance means, not rodents, but contractors who pay less than the prevailing wage, which was true. But we held that the banner "crossed the line separating protected rhetorical hyperbole from unpro-tected fraudulent misrepresentations of fact" because the man-

---

[2] *Id.* at 1233.

ner of display "could cause most — if not all — readers to be misled into believing" what we called "the most natural reading," that the hospital had a rodent problem.[3]

The most significant distinction between *San Antonio Community Hospital* and this case is that at least the banners in *San Antonio Community Hospital* said with whom the union's dispute really was, albeit in much smaller letters. In our case, there is no way for passersby to have their false impressions corrected unless they find a place to park, walk over to a union representative, and ask for a handbill. We considered the same First Amendment issues in *San Antonio Community Hospital* that are presented in this case, and despite a vigorous dissent, we held that because the speech was "fraudulent," it was unprotected.[4] The "deep historical meaning" claimed for the word "rats" by the union in *San Antonio Community Hospital*[5] is no different from the metaphysical parsing of the term "labor dispute" by the union in this case. The union's dispute was with secondary and tertiary employers, but the "most natural reading," the one that the banners would cause "most — if not all — readers to be misled into believing" was that the union thought that the employees of the firms — in front of which the banners were displayed — were being treated shamefully. And that was not so.

The hospital in *San Antonio Community Hospital* got an injunction and the Regional Director of the NLRB should get one in this case. Like cases should be treated alike.

---

[3]*Id.* at 1236-37.

[4]*Id.* at 1237.

[5]*Id.* at 1235.